WIGGINS, Justice.
An insurer sought a declaratory judgment stating it was not liable to the assign-ee of an excess commercial general liability (CGL) insurance policy for damages *727 awarded to the assignee in federal district court. The assignee brought a counterclaim against, the insurer for breach of contract. A jury concluded the .insurer was liable to the assignee for the damages under the excess CGL policy. On appeal, the court of appeals affirmed the verdict against the insurer but reversed the district court award of prejudgment interest and remanded the case to the district court with instructions. The insurer sought further review, which we granted. On further review, we affirm the court of appeals decision affirming the district court judgment. We conclude the district court did not err in instructing the jury to determine whether the claimed damages arose due to an “accident” constituting an “occurrence” under the policy by considering “the viewpoint of the insureds and what they intended or should reasonably have expected.” Additionally, we conclude the district court did not err in ruling defective work performed by an insured’s subcontractor may constitute an occurrence under the policy. The court of appeals decision will stand as the final decision of this court with respect to all other issues raised on appeal.
I. Background Facts and Proceedings.
In 2002, developers and a general contractor began construction on an apartment complex in West Des Moines. In the spring of 2003, while the complex was still under construction, Westlake Investments, LLC, (Westlake) entered into negotiations to purchase it. In June, Westlake executed a purchase agreement.
That summer, the developers and general contractor (the insureds) purchased a primary CGL insurance policy with a $1,000,000 policy limit from Arch Insurance Group (Arch) and an excess CGL insurance policy with a $20,000,000 policy limit from National Surety Corporation (NSC). The terms of the Arch policy defined the scope of coverage under the NSC policy, as the NSC policy followed the form of and incorporated by reference the terms, conditions, and exclusions of the Arch policy. Both policies became effective on July 1, 2003, and expired on July 1, 2004.
During construction, numerous problems surfaced within the complex, including visible water , penetration issues in several buildings. ; These problems did not hamper the sale to Westlake because the parties believed them to be aesthetic. However, that turned out not to be true. After the sale closed in November 2003, the construction defects throughout the complex continued to cause widespread water penetration issues.
In February 2008, Westlake sued the insureds in federal district court, seeking to recover lost profits, repair costs, and other damages under tort and contract theories. The insureds in turn sued numerous third-party defendants, including the architect who designed the complex and the subcontractors who helped to construct it.
As the primary insurer, Arch defended the suit on behalf of the insureds. After extensive pretrial litigation and discovery, Westlake and the insureds entered into settlement' negotiations. Those negotiations culminated in a settlement agreement between Westlake, the insureds, and all but one of the subcontractors in September 2011. See Westlake Invs., LLC v. MLP Mgmt., LLC, 842 F.Supp.2d 1119, 1121-25 (S.D.Iowa 2012).
In February 2012, the federal district court entered a consent judgment for $15,600,000 in favor of Westlake. Arch contributed $1,000,000 (the policy limit on the primary CGL policy) toward satisfaction of the judgment, and the third-party defendants contributed $1,737,500. Fol *728 lowing these contributions, $12,762,500 awarded in the judgment remained unsatisfied. Pursuant to the settlement agreement, the insureds assigned their- claims against NSC' on the excess CGL policy to Westlake.
In October 2011, shortly after the parties agreed to settle but before the federal district court entered the consent judgment against the insureds, NSC initiated this declaratory -judgment action-in state district court. Specifically, NSC sought entry of a declaration stating it had no obligation under the NSC policy to pay any portion of the judgment awarded to Westlake. Westlake countérclaimed for breach of contract and sought entry of a declaration stating the NSC policy obligated NSC to pay Westlake the unsatisfied portion of any judgment awarded to West-lake.
Following discovery, Westlake and NSC filed competing motions for summary judgment on various grounds, one of which is relevant to this appeal. Westlake argued property damage resulting from defective work performed by an insured’s subcontractor may constitute an accident that qualifies as an occurrence, covered by the Arch policy (and therefore the NSC policy). In response, NSC argued property damage caused by defective workmanship does not constitute an accident or an occurrence under a CGL insurance policy.
Following a hearing, the district court granted Westlake’s motion for partial summary judgment and denied NSC’s motion for summary judgment. The district court concluded property damage resulting from defective work performed by an insured’s subcontractor may constitute an accident and an occurrence under a post-1986 CGL insurance policy written to a general contractor.
The case proceeded to a jury trial in March 2014. Over the course of three weeks, the jury heard testimony from numerous witnesses, and the district court admitted hundreds of exhibits. At the close of the evidence, both parties moved ■for a directed verdict. The court denied both motions and declined to disturb its summary judgment ruling that property damage resulting from defective work performed by an insured’s subcontractor may constitute an accident and an occurrence under the Arch policy.
Before the district court submitted the case, to the jury, both parties objected to several jury instructions. Of particular relevance to this appeal, NSC objected to the jury instruction defining the terms “accident” and “occurrence” on the ground that the meaning of the term “accident” is objective rather than subjective. Accordingly, NSC proposed an instruction on the meaning of the term “occurrence” that defined the term “accident” as “an unde-signed, sudden and unexpected event.”
The district court overruled all the objections to the jury instructions, noting its instruction on the meaning of the -term “occurrence” relied on cases cited by both parties and concluding the instruction represented an accurate statement of Iowa law. Thus, the following jury instructions were among those the court submitted to the jury:
Instruction No. 19
[T]o prove the National Surety policy covers the .consent judgment damages, Westlake must show that:
1. Some or all of the consent .judgment damages resulted from “property damage” that was caused by an “occurrence,” and
2. Some or all of the consent judgment damages resulted from “property damage” that happened between July 1,2003 and July 1,2004..
Instruction No. 20
*729 As used in Instruction[1] No. 19, “property damage” means physical injury to tangible property, including all resulting loss of use of that property.[1] All such loss of use shall be deemed to occur at the time of the physical injury that caused it.
You are instructed that property damage happened at the Westlake apartment complex at some point in. time due to water intrusion. You must determine whether property damage happened during the policy period of July 1, 2003 to July 1,2004,
Instruction No. 21
As-used in Instruction Noi-19, an “occurrence”'is an.accident, including continuous or repeated exposure to substantially the same general harmful conditions. Defectiye construction work performed by an insured is not covered by the policy; however, defective construction work performed by subcontractors may be an “occurrence” under the policy.
“Accident” means an unplanned, sudden, and unexpected event.
Whether something is an “accident” must be determined from the viewpoint of the insureds and what they intended or should reasonably have expected.. An accident is unexpected so long as the insured does not expect both it and some damage.
The jury deliberated for just over an hour before returning a verdict in favor of Westlake. Following the jury verdict, the district court entered a judgment awarding Westlake $12,439,500 with interest accruing at the statutory rate from the date of the filing of the counterclaim.[1]
Westlake moved to amend the judgment with respect to prejudgment and post-judgment interest. Westlake argued the prejudgment interest on the damages awarded in the declaratory judgment action properly accrued from the date the federal suit settled rather than the date the counterclaim in the declaratory judgment action was filed- on the theory that the damages became liquidated damages when the parties settled. Westlake also requested an order clarifying the post-judgment interest on the damages awarded in - the declaratory judgment action would -accrue at the rate of five percént under Iowa Code section 535.2 (2013).'
The district court denied the motions. First, the court concluded the damages awarded in the consent judgment in the underlying action were not liquidated until the jury in the declaratory judgment action found them to be reasonable. Accordingly, the court determined prejudgment interest on the damages awarded in the declaratory judgment action accrued from the date Westlake filed its counterclaim, not the date the parties settled the underlying federal .-suit. The ruling did not expressly state which Iowa Code section governed the rate at which prejudg.ment interest accrued, however. Second, the court determined Iowa Code section 535.3 properly governed the rate at which postjudgment interest on the damages awarded in the declaratory judgment action would accrue.
Meanwhile, NSC moved for a judgment notwithstanding the verdict, arguing once again that property damage caused by defective workmanship does not constitute an *730 accident or an occurrence under Iowa law. NSC also moved for a new trial asserting the verdict was contrary to law and not supported by substantial evidence. West-lake resisted the motions.
Following oral argument, the district court denied both motions, finding there was substantial evidence in the record to support the juxy finding that Westlake’s damages resulted from property damage occurring within the policy period. NSC filed an expedited motion to enlarge and amend the district court ruling, requesting the district court to specifically rule on additional arguments raised in its posttrial motions. The district court denied the motion, but its ruling specified additional grounds for its denial of the posttrial motions.
NSC appealed. NSC argued the district court erroneously instructed the jury as to the meaning of the term “occurrence” because construction defects and resulting damage never constitute an occurrence under Iowa law. NSC also contended the court erroneously denied its motion for a new trial, arguing the jury did not deliberate before making its findings, the jury findings were not supported by substantial evidence, and the jury verdict was internally inconsistent. Finally, NSC asserted the court abused its discretion in declining to submit two proposed jury instructions to the jury.
In response, Westlake argued the district court correctly permitted the jury to decide the occurrence issue and correctly denied the motion for new trial. Westlake also cross-appealed, arguing the court erroneously denied its motion to amend the judgment regarding prejudgment interest.
We transferred the appeal to the court of appeals. The court of appeals affirmed the district court rulings on NSC’s posttrial motions, concluding the district court did not err in instructing the jury regarding the meaning of the term “occurrence.” The court of appeals also rejected NSC’s arguments that the jury did not deliberate, the jury findings were not supported by substantial evidence, and the jury verdict was internally inconsistent. On cross-appeal, the court of appeals concluded the district court correctly determined the date from which prejudgment interest on the damages awarded in the declaratory judgment action accrued but failed to specify the applicable statutory default interest rate in its ruling; The court of appeals thus reversed the district court ruling on prejudgment interest and remanded the case for entry of a supplemental judgment specifying Iowa Code section 535.2(l)(a) set the rate at which the prejudgment interest accrued.
NSC sought further review, which we granted.
II. Issues.
On further review, we may exercise our discretion to review all the issues raised on appeal or in the application for further review or only a portion thereof. Gits Mfg. Co. v. Frank, 855 N.W.2d 195, 197 (Iowa 2014). In this case, we exercise that discretion to consider only whether the district court erroneously instructed the jury as to what constitutes an occurrence covered by the Arch policy language incorporated by reference into the NSC policy. To decide this question, we must determine whether property damage caused by defective work performed by an insured’s subcontractor may constitute an accident, and therefore an occurrence, for which coverage exists under the policy language included in post-1986 standard-form CGL insurance'policies. The court of appeals decision will stand as the final decision of this court with respect to all other issues raised on appeal. Hills Bank & *731 Trust Co. v. Converse, 772 N.W.2d 764, 770 (Iowa 2009).
III. Scope of Review.
When a party challenges a jury instruction on the ground that the instruction was erroneous, we review the instruction for correction of errors at law. Anderson v. State, 692 N.W.2d 360, 363 (Iowa 2005). In contrast, we review a district court ruling refusing to give a requested instruction for an abuse of discretion. Id.
To the extent our review of a district court ruling rests upon its interpretation of an insurance policy, we ordinarily review that interpretation for correction of errors at law. Boelman v. Grinnell Mut. Reins. Co., 826 N.W.2d 494, 500 (Iowa 2013).
We likewise review a district court ruling denying a motion for a directed verdict for correction of errors at law. Crow v. Simpson, 871 N.W.2d 98, 105 (Iowa 2015).
IV. The Policy Language.
The NSC policy contains the following insuring agreement:
This coverage only applies to injury or damage covered by the Primary Insurance. The definitions, terms, conditions, limitations and exclusions of the Primary Policies, in effect at the inception date of this policy, apply to this coverage unless they are inconsistent with provisions of this policy or relate to premium, subrogation, other insurance, an obligation to investigate or defend, the amount or limits or insurance, payment of expenses, cancellation or any renewal agreement.
Subject to the other provisions of this policy, We will pay on behalf of the Insured those sums in excess of Primary Insurance that the Insured becomes legally obligated to pay as damages ....
If a Primary Policy applies on the basis of injury or damage which occurs during the period of that policy, then this coverage shall only apply on the same basis and in a like manner to injury or damage which occurs during Our Policy Period.
The NSC policy also identified the Arch policy as the “primary policy.” Accordingly, NSC acknowledges the NSC policy followed the form of and incorporated by reference certain terms, conditions, and exclusions of the Arch policy, including those defining the scope of the coverage it afforded the insureds.[2]
The NSC policy incorporated the following insuring agreement in the Arch policy:
We will pay those sums ... that the insured becomes legally obligated to pay as damages because of “bodily injury” or “property damage” to which this insurance applies.... This insurance applies only to “bodily injury” and “property damage” which occurs during the policy period. The “bodily injury” and “property damage” must be caused by an “occurrence.”
*732 The NSC policy also incorporated the following definitions appearing in the Arch policy:

“Occurrence” means an accident, including . continuous or repeated exposure' to substantially the same general harmful conditions.

[[Image here]]
“Property damage” means:
a. Physical injury to tangible properly, including all resulting loss of use of that property. All such loss of use will' be deemed to occur at the time of physical injury that caused- it; or
b. Loss of use of tangible property that is not physically injured. All such loss will be deemed to occur at the time of the “occurrence” that caused it_
(Emphasis added.) Although the term “accident” appeared in the definition of the term “occurrence” in the Arch policy, neither the Arch policy nor the NSC policy explicitly defined it.
The NSC policy also incorporated the following exclusions from coverage appearing in the Arch policy, each of which is relevant to this appeal:
This insurance does not apply to:
a. Expected or Intended Injury
“Bodily .injury” or “property damage” expected or intended from the standpoint of the insured —
[[Image here]]
j. Damage to Property
“Property damage” to:
[[Image here]]
(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the “property damage” arises out of those operations; or
[[Image here]]
(6) That particular part of any property that must be restored, repaired, or replaced because "your work” was incorrectly performed on it.

Paragraph (6) of this exclusion does not apply to property damage included in the “products-completed operations hazard. ”

[[Image here]]
l. Damage to “your work”
“Property damage” to “your work” arising out of it or any part of it and included in the “products-completed operation hazard.”

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

m. Damage to Impaired Property or Property Not Physically Injured
[[Image here]]
This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to “your product” or “your work” after it has been put to its intended use.
(Emphasis added.)
The NSC policy incorporated the following definition of the phrase “your work” appearing in the Arch policy:
“Your work”:
a.- Means:
(1) Work or operations performed by you or on your behalf, and
(2) Materials, parts, or equipment furnished in connection with such work or operations....
Finally, the NSC policy incorporated the following endorsement addressing “proper *733 ty damage to construction projects” from the Arch policy:
This insurance does not apply to property damage to the “project” or any party of the “project” that occurs during the course of construction. The project or part of the project will be deemed to be within the course of construction until it satisfies the definition of “products-completed operations hazard” as defined in this endorsement.
[[Image here]]
a. “Products-completed operations hazard” includes all “bodily injury” and “property damage” arising out of “your product” or “your work” except:
i. Products that are still in your physical possession; or

ii. Work that has not yet [been] completed or abandoned.

b. ‘Tour work” will be deemed completed at the earliest of the following times:
i. Completion and acceptance of the entire “project” by all parties designated in its construction agreement;
ii. When all of the work to be done at the site has been completed if the “project” calls for work at more than one site;
iii. When that part of the work done at the “project” has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same “project;” or [sic]

Work that may need service maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

(Emphasis added.)
With the exception of the endorsement defining the scope of the “products-completed operations hazard” under the Arch policy, the terms of the Arch policy relevant to this appeal mirror those appearing in the 1986 standard-form CGL policy drafted by the Insurance Services Office, Inc. (ISO). ISO is an association of domestic property and casualty insurers that develops standard-form policies widely used in the insurance-industry. Hartford Fire Ins. Co. v. California, 509 U.S. 764, 772, 113 S.Ct. 2891, 2896, 125 L.Ed.2d 612, 623 (1993). As the Supreme Court has noted, “most CGL insurance written in the United States is written on these forms.” Id. Today, virtually every contractor in the construction industry carries a CGL policy that is substantially identical to one of the ISO’s standard-form CGL policies. See James Duffy O’Connor, What Every Court Should Know About Insurance Coverage for Defective Construction, 5 J. Am. C. Constr. Law. No. 1, at 1, 1 (2011) [hereinafter O’Connor].
V. Interpretive Principles.
In order to determine whether the district court erred, we must determine the meaning of the policy language governing the scope of coverage afforded by the NSC policy. We therefore begin our analysis by describing the principles that guide our interpretation of insurance policies.
When we interpret an insurance policy, we determine the meaning of the words that govern its legal effect. See Thomas v. Progressive Cas. Ins. Co., 749 N.W.2d 678, 681 (Iowa 2008). The cardinal principle guiding our interpretation is that the intent of the parties at the time the policy was sold controls. LeMars Mut. Ins. Co. v. Joffer, 574 N.W.2d 303, 307 (Iowa 1998). To determine the parties’ intent, we look to the language of the policy unless the meaning of that language is ambiguous. Id. When the language of the policy is ambiguous, we adopt the con *734 struction most favorable to the insured. Boelman, 826 N.W.2d at 502. Because insurance policies are contracts of adhesion, an insurer assumes a duty to define in clear and explicit terms any limitations or exclusions to the scope of coverage a policy affords. Id. Nevertheless, where no ambiguity exists, we will not write a new policy to impose liability on the insurer. Id.
The mere fact that parties disagree as to the meaning of terms in an insurance policy does not establish the policy is ambiguous. Id. Rather, we determine whether an insurance policy is ambiguous by applying an objective test. Id. at 501. Policy language is ambiguous when, considered in the context of the policy as a whole, it is susceptible to two plausible interpretations. Id. Thus, we determine whether an ambiguity exists not by examining clauses seriatim, but by interpreting the policy in its entirety, including all endorsements, declarations, or riders attached. Id. at 501-02.
When interpreting an insurance policy, we give each policy term not defined in the policy its ordinary meaning. Id. at 501. We determine the ordinary meaning of the words in an insurance policy from the standpoint of a reasonable ordinary person, not from the standpoint of a specialist or an expert. Grinnell Mut. Reins. Co. v. Jungling, 654 N.W.2d 530, 536 (Iowa 2002). We strive to interpret every term in an insurance policy in a manner that will not render it superfluous unless it is evident that adopting an interpretation giving meaning to a term would be unreasonable when we consider the term in context. Kibbee v. State Farm Fire & Cas. Co., 525 N.W.2d 866, 869 (Iowa 1994).
VI. Analysis.
The district court instructed the jury that the term “accident” means “an unplanned, sudden, and unexpected event ... determined from the viewpoint of the insureds and what they intended or should reasonably have expected.” The court provided the jury a separate instruction stating, “Defective construction work performed by an insured is not covered by the policy; however, defective construction work performed by subcontractors may be an ‘occurrence’ under the policy.”
Before the court submitted the case to the jury, NSC objected to the jury instruction defining the terms “accident” and “occurrence.” Specifically, NSC proposed a jury instruction defining an accident as “an undesigned, sudden and unexpected event” and argued the term should be interpreted objectively. NSC subsequently moved for a directed verdict, arguing that defective workmanship does not constitute an accident or an occurrence under controlling Iowa law. On appeal, NSC argued the district court erroneously instructed the jury as to the meaning of “occurrence” because construction defects and resulting damage never constitute an occurrence.[3]
*735 We first consider whether the district court erroneously instructed the jury to determine whether an accident occurred by considering “the viewpoint of the insureds and what they intended or .should reasonably have expected.” We previously concluded an intentional act resulting in unexpected and unintended property damage qualifies as an accident that amounts to an occurrence covered by a CGL policy so long as the insured did not expect and intend both the act itself and the resulting harm in West Bend Mutual Insurance Co. v. Iowa Iron Works, Inc., 503 N.W.2d 596, 600-01 (Iowa 1993).
The standard-form CGL policy we interpreted in West Bend defined the term “occurrence” as “an accident,. including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.” Id. at 600. In contrast, the modern standard-form CGL policy upon which the Arch policy was based defines the term “occurrence” as “an accident, including continuous or repeated exposure to substantially the same general harmful conditions.” However, it also contains an exclusion and an exception to an exclusion particularly relevant to the meaning of the term “accident.” Namely, it contains an exclusion from coverage for property damage “expected or intended from the standpoint of the insured”[4] and an exception to an exclusion from coverage assuring the insured may collect certain damages “arising out of sudden and accidental physical injury” to work product in limited circumstances.[5]
An undefined term in an insurance policy must be construed in light of the entire policy, including any exclusions. See Boelman, 826 N.W.2d at 501-02. Hence, we previously recognized a CGL policy containing an exclusion precluding coverage for damage “expected or intended from the standpoint of the insured” relies on the “common definition” of the term “accident” as “an unexpected and unintended event.” United Fire & Cas. Co. v. Shelly Funeral Home, Inc., 642 N.W.2d 648, 652 (Iowa 2002) (quoting Weber v. IMT Ins. Co., 462 N.W.2d 283, 287 (Iowa 1990)). Moreover," we previously found the use of the words “sudden and accidental” in a CGL insurance policy forecloses any interpretation of the term “sudden” that would render that term redundant in light of our interpretation of the term “accidental” Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Farmland Mut. Ins. Co., 568 N.W.2d 815, 818 (Iowa 1997).
Applying the same logic, we conclude that in the context of a modern standard-form CGL policy containing an exclusion precluding coverage for property damage “expected or intended from the standpoint of file insured,” the term “accident” means “an unexpected and unintended event.” See Shelly Funeral Home, 642 N.W.2d at 652; cf. 4 Douglas L. Patín, *736 Law & Practice of Insurance Coverage Litigation § 45:9, Westlaw (database updated July 2015) (concluding “there is no significant difference” between the definition of “occurrence” contained in the 1973 and 1986 standard-form CGL policies). An intentional act resulting in property damage the insured did not expect or intend qualifies as an accident amounting to an occurrence as defined in a modern standard-form CGL policy so long as the insured did not expect and intend both the act itself and the resulting property damage. See W. Bend Mut., 503 N.W.2d at 600-01.
Considered from the standpoint of the insured, “a deliberate act, performed negligently, is an accident if the effect is not the intended or expected result; that is, the result would have been different had the deliberate act been perr formed correctly.” Lamar Homes, Inc. v. Mid-Continent Cas. Co., 242 S.W.3d 1, 8 (Tex.2007); see Shelly Funeral Home, 642 N.W.2d at 653 (rejecting the argument that “the standpoint of .the insured is irrelevant” in determining whether an accident constituting an occurrence triggering CGL coverage took place). Accordingly, an intentional act does not constitute an accident that qualifies as an occurrence covered by a modern standard-form CGL policy when the resulting harm “was the natural and expected result of the insured’s actions, that is, was highly probable whether the insured was negligent of not.” Lamar Homes, 242 S.W.3d at 9; see Shelly Funeral Home, 642 N.W.2d at 653-55 (concluding injuries resulting from an insured’s negligent supervision of an employee constituted an occurrence because the insured did not know harmful consequences would flow from its own acts or omissions).
Accordingly, we conclude the district court correctly instructed the jury to determine whether the claimed damages arose due to an accident that constituted an occurrence eligible for coverage under the insuring agreement in the Arch policy by considering “the viewpoint of the insureds and what they intended or should reasonably have expected.”[6] Whether an event amounts to an accident that eonsti-tutés an occurrence triggering coverage under a modern standard-form CGL policy turns on whether the event itself and the resulting harm were both “expected or intended from the standpoint of the insured.”
We next consider whether the district court erroneously denied NSC’s motion for directed verdict. The court denied •NSC’s motion because it concluded defective work performed by an insured’s subcontractor may constitute an occurrence under the Arch policy. NSC claims defective workmanship cannot constitute an accident or an occurrence as a matter of law.
The cornerstone of NSC’s argument that defective workmanship never constitutes an accident or an occurrence under Iowa law is Pursell Construction v. Hawkeye-Security Insurance, 596 N.W.2d 67 (Iowa 1999). In Pursell, we considered *737 whether a CGL policy covered damages arising from breach-of-contract and negligence claims brought against an insured who failed to construct two houses in a floodplain at the elevation required by city ordinance, thereby causing the houses to be uninhabitable. Id. at 68. We treated the claim against the insurer as one for the cost of repairing the insured’s own defective workmanship, as the1 claimed damages were the cost of raising the elevation of the houses by approximately two feet. Id. at 68, 70. We concluded the policy did not cover the cost of repairing an insured’s own defective work product because-“defective workmanship standing alone, that is, resulting in-damages only to the work product itself, is not an occurrence under a CGL policy.” Id. at 71.' In arriving at this conclusion, we reasoned that interpreting the policy to cover repairs .to sthe insured’s own defective workmanship would convert the insurer into “a guarantor of the insured’s performance” on a contract, causing the policy to take'on “the attributes of a, performance bond.” Id. (quoting U.S. Fid. & Guar. Corp. v. Advance Roofing & Supply Co., 163 Ariz. 476, 788 P.2d 1227, 1233 (Ariz.Ct.App.1989)).
For several reasons, we reject NSC’s argument that Pursell is controlling in this case. First, determining whether defective work performed by an insured’s subcontractor may constitute an occurrence covered by the Arch policy requires us to consider the entire policy before us, including its relevant exceptions and exclusions. See Boelman, 826 N.W.2d at 601-02. Notably, the standard-form CGL policy upon which the Arch policy was based defines the term “occurrence” .as “an accident, including continuous or repeated exposure to substantially the same general harmful conditions,” but it does not define the term “accident.” Interpreting an undefined term in an insuring agreement requires us to determine whether the term is ambiguous in the context of the policy as a whole. Id. Consequently, interpreting the insuring agreement in the Arch policy requires us to evaluate the meaning of the term “accident” in the context of the policy as a whole. In Pursell, we did not address whether language contained in the exceptions and exclusions appearing in the body of the. policy created any ambiguity with respect to the meaning of the term “accident.” See 596 N.W.2d at 69-70.
Relatedly, Pursell is factually distinguishable from the present case. In Pur-sell, the contractor who performed the defective work was the insured. Id. at 68. The only damage alleged to have resulted from the defective work was the cost of repairing the insured’s own defective work product. - Id. at 68, 70-71. In contrast, Westlake proved defective installation of the building wrap and flashings resulted in water penetration that caused widespread consequential damage to interior building components that were not defective, including the wood framing, drywall, insulation, carpet, nails, staples, and other metal fasteners inside the walls.[7] Westlake also established the defective work that led to the claimed damages was performed by insureds’ subcontractors, not the insureds themselves. .
*738 Most importantly, our holding in Pursell was limited by its plain language to situations in which the insured performed defective work and sought coverage for the cost of repairing the defective work product. Id. at 71. By implication, Pursell anticipated that a CGL policy might provide coverage for at least some claims arising from defective construction, just not claims seeking coverage for repairing or replacing the insured’s own defective work product.[8]
Finally, although we have never explicitly overruled Pursell, we later interpreted identical language defining the terms “accident” and “occurrence” in a CGL policy to cover compensatory damages awarded based on an insured’s negligent supervision in Shelly Funeral Home, 642 N.W.2d at 653. As here, the claim we considered in Shelly Funeral Home stemmed from a suit against an insured in which one third party who was not a party to an insurance contract sought damages against the insured for harm caused by another third party who worked under the insured’s supervision. Id. at 651. Because the policy explicitly precluded coverage for harm “expected or intended from the standpoint of the insured,” we reasoned, it relied upon “the common definition” of the term “accident” as an “unexpected and unintended” event. Id. at 652-53 (citing Weber, 462 N.W.2d at 287). We therefore determined harm resulting from the insured’s negligent supervision of an employee constituted an occurrence for which there was coverage under the policy’s insuring agreement because the insured did not expect or intend the harmful consequences that flowed from its own acts or omissions. Id. at 653-54. We concluded that when “an injury occurs without the agency of the insured, it may be logically termed ‘accidental,’ even though it may be brought about designedly by another person.” Id. at 654 (quoting Silverball Amusement, Inc. v. Utah Home Fire Ins. Co., 842 F.Supp. 1151, 1157-58 (W.D.Ark.), aff'd, 33 F.3d 1476 (8th Cir.1994)).
Our holding in Shelly Funeral Home calls into question the applicability of the holding NSC relies upon in the context of the claim before us.[9] NSC essentially argues the claimed damages arose due to the insureds’ negligent supervision of the subcontractors whose defective workmanship resulted in damage to the Westlake complex.
We are unable to identify any case in which this court previously considered the question of whether defective work negli *739 gently performed by an insured’s subcontractor may constitute an occurrence covered by a modern standard-form CGL policy. Our past cases considering whether defective workmanship constituted an occurrence triggering coverage under an insurance policy based on the modern standard-form CGL policy under Iowa law involved defective work performed by the insured, not the insured’s subcontractor. See Pursell, 596 N.W.2d at 68; Yegge v. Integrity Mut. Ins. Co., 534 N.W.2d 100, 101 (Iowa 1995); see also Liberty Mut. Ins. Co. v. Pella Corp., 650 F.3d 1161, 1164 (8th Cir.2011).
NSC argues the exceptions and exclusions the Arch policy contains are irrelevant to the question of what qualifies for coverage under its insuring agreement. We disagree.
To determine if an insurance policy affords coverage under a particular set of circumstances, we generally look first to the insuring agreement, then to the exclusions and the exceptions to the exclusions. Pursell, 596 N.W.2d at 69. But before we can construe the language in an insuring agreement, we must first determine whether it is ambiguous. See Boelman, 826 N.W.2d at 501. In making that determination, our analysis begins with consideration of the policy as a whole. See id. at 501-02. Thus, although exceptions and exclusions cannot “create coverage that otherwise is lacking” under an insuring agreement, they offer insight into whether coverage exists under an insuring agreement by shedding light on what the.terms it contains mean. Amish Connection, Inc. v. State Farm Fire & Cas. Co., 861 N.W.2d 230, 239 (Iowa 2015) (quoting Hartford Cas. Ins. Co. v. Evansville Vanderburgh, Pub. Library, 860 N.E.2d 636, 646 (Ind.Ct.App.2007)); see U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So.2d 871, 886 (Fla.2007); Sheehan Constr. Co. v. Cont’l Cas. Co., 935 N.E.2d 160, 171 (Ind.2010).
Reading the Arch policy as a whole, we conclude it plainly contemplates coverage for some property damage caused by defective work performed by an insured’s subcontractor. In short, interpreting the term “accident” or the term “occurrence” so narrowly as to preclude coverage for all property damage arising from negligent work performed by an insured’s subcontractor would be unreasonable in light of the exceptions and exclusions the Arch policy contains.
For example, the policy’s “damage to property” exclusion generally excludes from coverage property damage to the “particular part of any property that must be restored, repaired, or replaced” due to work “incorrectly performed on it” by or on behalf of the insured.[10] Nonetheless, this exclusion does not apply to property damage included within the policy’s definition of “products-completed operations hazard.” Thus, property damage requiring property to be restored, repaired, or replaced due to work incorrectly performed on it by or on behalf of the insured is generally hot excluded from coverage if the property damage arises out of completed work.[11] 18 New Appleman on Insurance Law Library Edition § 18.03[13][iv], at 18-91 (Jeffrey E. Thomas & Francis J. Mootz, III, eds., 2015); see Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 268 Wis.2d 16, 673 N.W.2d 65, 81-82 (2004).
Similarly, the policy’s “your work” exclusion generally excludes from coverage *740 property damage arising out of completed work performed by or on behalf of the insured.[12] However, the exclusion contains an exception indicating property damage to work performed on behalf of the insured remains compensable assuming no other coverage exclusion applies if it was performed by the insured’s subcontractor. Specifically, it states the “your work” exclusion does not apply if.“the damaged work or the work out of which the damage arises was performed ... by a subcontractor” on behalf of the insured.[13] The effect of this subcontractor exception to the “your work” exclusion is to preserve coverage the, “your work” exclusion would otherwise negate. K & L Homes, Inc. v. Am. Family Mut. Ins. Co., 829 N.W.2d 724, 737 (N.D.2013) (quoting Lamar Homes, 242 S.W.3d at 12); see 18 New Appleman on Insurance Law Library Edition § 18.03[12][d], at 18-95.
It would be illogical for an insurance policy to contain an exclusion negating coverage its insuring agreement did not actually provide or an exception to an exclusion restoring it. See Greystone Constr., Inc. v. Nat’l Fire & Marine Ins. Co., 661 F.3d 1272, 1287 (10th Cir.2011); J.S.U.B., 979 So.2d at 880; Sheehan Constr., 935 N.E.2d at 171; Lee Builders, Inc. v. Farm Bureau Mut. Ins., Co., 281 Kan. 844, 137 P.3d 486, 494 (2006); Architex Ass’n, Inc. v. Scottsdale Ins. Co., 27 So.3d 1148, 1161 (Miss.2010). Just as we will not strain to interpret an insurance policy to impose liability on an insurer, we will not strain to interpret an insurance policy to deprive an insured of coverage the policy clearly contemplates. See Boelman, 826 N.W.2d at 501-02. Nor will we interpret an insurance policy in a manner that renders an exception or exclusion it contains to be superfluous unless it is evident interpreting the policy to give meaning to a particular exception or exclusion would be unreasonable- in the context of the structure and format of the policy as a whole. Cf. Kibbee, 525 N.W.2d at 869.
We think a reasonable ordinary person who read the modem standard-form CGL policy containing the subcontractor exception to the “your work” exclusion in its entirety would believe it covered defective work performed by the insured’s subcontractor unless the resulting property damage was specifically precluded from coverage by an exclusion or endorsement. See Jungling, 654 N.W.2d at 536. Accordingly, we interpret the insuring agreement in the modern standard-form CGL policy as providing coverage for property damage arising out of defective work performed by an insured’s subcontractor unless the resulting property damage is specifically precluded from coverage by an exclusion or endorsement. In addition, we conclude the defective work performed by the insureds’ subcontractors falls within the .definition of “occurrence” in the insuring agreement appearing in the Arch policy.
Our conclusion that the insuring agreement in a modern standard-form CGL policy ordinarily covers property damage arising due to defective workmanship by an insured’s subcontractor is reinforced by both the nature of the ISO’s standard-form CGL policy and its evolution.. The purpose of CGL policies used in the home-construction industry is to protect home-builders from risks associated with homeowners asserting postconstruction claims for damage to homes caused by alleged construction defects. Auto Owners Ins. *741 Co. v. Newman, 385 S.C. 187, 684 S.E.2d 541, 545 (2009). Construction-specific exclusions narrow the scope of coverage afforded, by standard-form CGL policies and exclude from coverage property damage associated with certain categories of risks. Id. Over time, the language contained in the insuring agreements and the exclusions appearing in standard-form CGL policies have been periodically updated to adjust the scope of coverage such policies afford.
The precursor to the modern standard-form CGL policy was promulgated in 1940 and subsequently underwent five principal revisions, the most recent of which occurred in 1986. Sheehan Constr., 935 N.E.2d at 162. Unlike the 1986 version of the standard-form CGL policy upon which the Arch policy was based, prior versions of the standard-form CGL policy contained an exclusion precluding coverage for “property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith.” Id. (quoting French v. Assurance Co. of Am., 448 F.3d 693, 700 (4th Cir.2006)). Courts interpreted the language of this “work performed” exclusion to preclude from coverage property damage resulting from work performed by an insured’s subcontractor, including damage to the insured’s own work. See French, 448 F.3d at 700. As subcontractors grew increasingly integral to the construction industry, however, many general contractors became unhappy with /the scope of coverage provided under standard-form CGL policies. Greystone, 661 F.3d at 1287. “General contractors needed coverage for property damage that arose from the work of their subcontractors, a risk they could not control by the exercise of general supervision and coordination.” „ O’Connor, 5 J. Am. C. Constr. Law., no. 1, at 5.
The insurance industry responded by Offering two versions of an optional broad form property damage (BFPD) endorsement intended to narrow the “work performed” exclusion. Scott C. Turner, Insurance Coverage of Construction Disputes § 3:8, Westlaw (database updatéd June 2016). With respect to ongoing work, both versions of the endorsement narrowed the “work pérformed” exclusion to preclude coverage only for “that particular part” of the ongoing work that was defective, rather than “any portion” of the insured’s ongoing work. Id. With respect to completed work, one version of the endorsement also eliminated the “on behalf of’ language from the “work performed" exclusion. Id. The elimination of this language effectively extended liability coverage under a CGL policy including the endorsement to damage arising out of work performed by an insured’s subcontractor. ' Greystone, 661 F.'3d at 1288.
By the mid-1970s, insureds were paying higher premiums to add the latter endorsement to their CGL policies in order to extend their CGL coverage to damage arising out of their subcontractors’ work. See id.; French, 448 F.3d at 701. By 1986, the BFPD endorsement extending liability coverage to work performed by subcontractors was so popular that the ISO incorporated. it directly into the body of its standard-form CGL policy in the form of a subcontractor exception to the “your work” exclusion. See O’Connor, 5 J. Am. C. Constr. Law., no. 1, at-5. “This resulted both because of the demands of the policyholder community ... and the view of insurers that the CGL was a more attractive product that could be better sold if it contained this coverage.” Greystone, 661 F.3d at 1288 (quoting 2 Jeffrey W. Stempel, Stempel on Insurance Contracts § 14.13[D] (2007)).
*742 Following the 1986 revisions to its standard-form CGL policy, the ISO broadcast to both the construction and insurance industries that the revisions were intended to extend CGL coverage under standard-form policies to property damage arising from defective construction, O’Connor, 5 J. Am. C. Constr. Law., no. 1, at 5-6. In a circular intended to provide guidance regarding the impact of the 1986 revisions, the ISO confirmed their effect was to provide coverage for “damage caused by faulty workmanship to other parts of work in progress; and damage to, or caused by, a subcontractor’s work after the insured’s operations are completed.” J.S.U.B., 979 So.2d at 879 (quoting Insurance Services Office Circular, Commercial General Liability Program Instructions Pamphlet, No. GL-86-204 (July 15,1986)).
The history of the standard-form CGL policy and the industry’s own interpretative literature over the course of that history confirm that our interpretation of the insuring agreement in the Arch policy is correct. Of course, “CGL policy provisions have a special meaning within' the insurance industry, which includes the insurance brokers and risk managers who advise contractors, real estate developers, and others within the construction industry as to what CGL coverage to purchase.” Turner, Insurance Coverage of Construction Disputes § 3:8. Clearly, the 1986 standard-form CGL policy upon which the Arch policy was based “was specifically designed to provide general contractors with at least some insurance coverage for damage caused by the faulty workmanship of their subcontractors.” Greystone, 661 F.3d at 1287. Consequently, our conclusion that defective work performed by an insured’s subcontractor may constitute an occurrence triggering coverage under the modern standard-form CGL policy reflects the overwhelming trend among courts and commentators interpreting such policies. See, e.g., Greystone, 661 F.3d at 1290 (applying Colorado law); French, 448 F.3d at 706 (applying Maryland law); J.S.U.B., 979 So.2d at 888 (Florida); Sheehan Constr., 935 N.E.2d at 171 (Indiana); Lee Builders, 137 P.3d at 495 (Kansas); Architex, 27 So.3d at 1161 (Mississippi); K & L Homes, 829 N.W.2d at 736 (North Dakota); Auto Owners Ins., 684 S.E.2d at 544 (South Carolina); Lamar Homes, 242 S.W.3d at 11; Travelers Indem., 216 S.W.3d at 310 (Tennessee); Am. Girl, 673 N.W.2d at 83-84 (Wisconsin); see also Turner, Insurance Coverage of Construction Disputes § 33:9 (listing cases and commentators interpreting standard-form CGL policies to cover property damage caused by subcontractor work in light of the subcontractor exception to the “your work” exclusion).
Finally, our decision is further reinforced by recent decisions of other state supreme courts inteipreting CGL policies containing the subcontractor exception to the “your work” exclusion in the context of property damage arising when exposure to moisture resulted from defective workmanship. Sheehan Constr., 935 N.E.2d at 171-72; Lee Builders, 137 P.3d at 489, 494; Travelers Indem., 216 S.W.3d at 304, 306.
In particular, the Indiana Supreme Court recently determined a CGL policy containing the subcontractor exception to the “your work” exclusion covered water damage caused by the defective work of the insured’s subcontractors. Sheehan Constr., 935 N.E.2d at 163-64. The defective workmanship included,
lack of adequate flashing and quality caulking around the windows, lack of a weather resistant barrier behind the brick veneer to protect the wood components of the wall, improperly installed roofing shingles, improperly flashed or sealed openings for the chimney and *743 vents, and inadequate ventilation in the crawl space.
Id. at 163. The court concluded the question of whether repair or replacement of “leaking windows, fungus growth on the siding, decayed OSB sheathing, deteriorating and decaying floor joists, and ... water stained carpeting” was covered under the policy turned on whether the defective workmanship was “intentional from the viewpoint of the insured.” Id. at 163,169-72. In arriving at this conclusion, the court noted,
A shingle falling and injuring a person is a natural consequence of an improperly installed shingle just as water damage is a natural consequence of an improperly installed window. If we assume that either the shingle or the window installation will be completed negligently, it is foreseeable that damages will result. If, however, we assume that the installation of both the shingle and the window will be completed properly, then neither the falling shingle nor the water penetration is foreseeable and both events are “accidents.”
Id. at 170 (quoting Travelers Indem., 216 S.W.3d at 309).
Similarly, the Kansas Supreme Court recently determined a CGL policy containing the subcontractor exception to the “your work” exclusion covered property damage caused by continuous exposure to moisture arising due to faulty materials and workmanship provided by the insured’s subcontractor because the resulting damage was “both unforeseen and unintended.” Lee Builders, 137 P.3d at 489-91, 496. In doing so, the court reasoned that clearly distinguishing between what constituted an occurrence and what did not was the obligation of the insurer who drafted the policy. Id. at 495. Accordingly, the court determined coverage existed in part because, even if the court were to assume the policy language defining an “occurrence” as “an accident, including continuous or repeated exposure to substantially the same general harmful conditions” was ambiguous, it was required to construe such ambiguity against the insurer. Id.
Likewise, the Tennessee Supreme Court recently determined property damage arising due to water penetration resulting from an insured’s subcontractor’s faulty installation of windows constituted an occurrence covered by a CGL policy containing the subcontractor exception to the “your work” exclusion. Travelers Indem., 216 S.W.3d at 304, 306. The court rejected the insurer’s argument that water penetration was not unforeseen or unexpected from the standpoint of the insured because it was a natural consequence of faulty window installation. Id. at 308. Interpreting the term “accident” in a manner that would exclude from coverage all property damage arising from negligence, the court reasoned, would render CGL policies “almost meaningless.” Id. Accordingly, the court compared water penetration caused by defective window installation “to the automobile accident that is caused by the faulty tire.” Id. at 310. The court thus concluded the property damage resulting from water penetration constituted an occurrence covered by the policy because the insured could not have foreseen the water penetration if the work had been completed properly. Id. at 311.
As the United States Court of Appeals for the Tenth Circuit has observed, “the degree of business risk that is covered by a CGL policy is a negotiated agreement between contractual parties, which should not be disturbed by a court’s view of whether business-risk coverage is appropriate.” Greystone, 661 F.3d at 1288. Insurers know how to modify the allocation of risk in CGL policies should *744 they wish to do so. See id.; J.S.U.B., 979 So.2d at 891; see also Lamar Homes, 242 S.W.3d at 12; 18 New Appleman on Insurance Law Library Edition § 18.03[12][d], at 18-95. Therefore, we decline to interpret the ambiguous insuring agreement in the Arch policy to preclude coverage for the property damage Westlake claimed. See Boelman, 826 N.W.2d at 502.
For the foregoing reasons, we conclude defective workmanship by an insured’s subcontractor may constitute an occurrence under a modern standard-form CGL policy containing a subcontractor exception to the “your work” exclusion. Wé therefore conclude the court of appeals correctly determined the district court correctly interpreted the Arch policy.'
VII. Disposition.
Determining whether coverage exists under an insurance policy requires us to determine whether its terms are ambiguous in the context of the policy as a whole, including all relevant exceptions and exclusions. Accordingly, we conclude defective workmanship by an insured’s subcontractor may constitute an occurrence under the terms of the Arch policy incorporated by reference into the NSC policy. We thus affirm the court of appeals decision affirming the district court rulings as to the meaning of the term “occurrence” foi’ purposes of determining the scope of coverage afforded by the Arch policy. The court of appeals decision shall stand -as the final decision of this court with respect to all other issues raised on appeal. Therefore, we affirm in part and reverse in part the district court judgment and -remand the case to the district court with instructions to enter a supplemental judgment specifying the statutory rate at which prejudgment interest accrued consistent with the decision of the court of appeals.
DECISION OF THE COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED WITH INSTRUCTIONS.
All justices concur except WATERMAN, J., CADY, C.J., and MANSFIELD, J., who dissent.

. The judgment awarded by the district court reflected the portion of the consent judgment award that remained unsatisfied when the declaratory judgment was entered. By[1] the time the declaratory judgment was entered, Westlake had been awarded an additional $253,000 following a bench trial to determine the liability of the subcontractor who declined to join in the settlement agreement.

. It is common for an excess insurance policy providing coverage in addition to ,that provided by an underlying primary insurance policy to “follow the form” of and incorporate the scope of coverage afforded under the primary policy. 4 Philip L. Bruner & Patrick J. O'Connor, Jr., Bruner & O'Connor on Construction Law § 11:542, Westlaw (database updated Mar. 2016). However, the extent to which the scope of coverage afforded by a follow-form excess policy mirrors that of the underlying primary policy ultimately depends upon the language it contains. Id, In this case, the parties do not dispute which terms of the Arch policy defined the scope of coverage afforded under the NSC policy.

. The jury instruction NSC proposed on the meaning of "occurrence” did not explicitly exclude all property damage arising due to defective construction, In relevant part, it stated,
To establish that the "property damage” was caused by an "occurrence,” Westlake must prove that reasonable and prudent parties in the positions of [the insureds] did not know of or expect, and should not have known of or expected, property damage resulting from defective construction. You do not, however, have to find that [the insureds] knew of, expected or should have known of, or should have expected, the full extent of the damages resulting from the defective construction in order to find there was no “occurrence.”
NSC requested a separate instruction that stated,
*735 Damages resulting from "properly damage" to the Westlake apartments caused by defective construction are not caused by “occurrence." Westlake must prove by a preponderance of the evidence that the property damage was not caused by defective construction.
Westlake argues NSC waived its argument that property damage caused by defective workmanship never constitutes an occurrence by requesting neither a jury instruction re-fleeting this theory nor a judgment in its favor on this basis. For purposes of our analysis, we assume without deciding that NSC preserved error.

. See exclusion (a) reproduced in section IV of this opinion.

. See exclusion (m) reproduced in section IV of this opinion.

. Though the jury instruction defined "accident” as "an unplanned, sudden, and unexpected event” rather than "an unexpected and unintended event,” we need not consider whether the district court’s inclusion of a temporal component in this definition was erroneous because NSC's proposed instruction on the meaning of "occurrence" defined "accident” to mean "an undesigned, sudden and unexpected event.” In any event, we note that ongoing exposure to harmful conditions appears to qualify as an accident that constitutes an occurrence covered by the Arch policy, as the policy defined “occurrence” as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

. NSC argues the damages in the consent judgment included the cost of removing and reinstalling the defectively installed building wrap and flashings. However, Westlake established this defective work product resulted from defective work performed by the insureds' subcontractors, not the insureds themselves. In addition, Westlake presented evidence demonstrating- r penetration 'caused widespread consequential physical damage to interior building components underneath the building wrap and flashings such that removing the building envelope was a necessary step in repairing the consequential damage to other parts of the complex.

. Because NSC does not dispute that the damage to the apartment complex resulted from the insureds’ subcontractors' defective workmanship, we need not consider whether property damage arising due to the insured’s own defective workmanship may constitute an occurrence in the context of a modern standard-form CGL policy containing the exclusions the Arch policy contains.

. We need not decide whether to overrule Pursell to decide the case before us, as the damages Westlake claims arose because defective work performed by the insureds’ subcontractors caused extensive property dam-áge to the complex. We note many courts that have concluded defective workmanship does not constitute an occurrence under circumstances similar to those we considered in Pursell have subsequently concluded defective workmanship performed by an insured’s subcontractor may constitute an occurrence covered by the insuring agreement in a modern standard-form CGL policy. See, e.g., Sheehan Constr. Co. v. Cont’l Cas. Co., 935 N.E.2d 160, 170 (Ind.2010); Architex Ass’n, Inc. v. Scottsdale Ins. Co., 27 So.3d 1148, 1157-61 (Miss.2010); Auto Owners Ins. Co. v. Newman, 385 S.C. 187, 684 S.E.2d 541, 544-45 (2009); Travelers Indem. Co. of Am. v. Moore & Assocs., Inc., 216 S.W.3d 302, 308, 310-11 (Tenn.2007); Lamar Homes, 242 S.W.3d at 8-12; Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 268 Wis.2d 16, 673 N.W.2d 65, 75-78, 84 (2004).

. See exclusion (j)(6) and paragraph (a)(1) of the definition of "your work” reproduced in section IV of this opinion.

. See exclusion. (j)(6), the exception to exclusion (j)(6), and the definition of the “products-completed operations hazard” reproduced in section IV of this opinion.

. See exclusion (Z), paragraph (a)(1) in the definition of “your work,” and the definition of the "products-completed' Operations hazard” reproduced in section IV of this opinion.

. See the exception to exclusion (l) reproduced in section IV of this opinion.