# IN THE COURT OF APPEALS OF IOWA

No. 17-2091
Filed November 6, 2019

**ADDISON INSURANCE COMPANY,**
    Plaintiff-Appellee,

**vs.**

**MEP CO.,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Lee (North) County, John G. Linn,
Judge.

A defendant appeals the district court's declaratory judgment in favor of the
plaintiff. **AFFIRMED.**

Jeffrey A. Stone and Robert S. Hatala of Simmons Perrine Moyer Bergman,
PLC, Cedar Rapids, for appellant.

Matthew G. Novak and Stephanie L. Hinz of Pickens, Barnes & Abernathy,
Cedar Rapids, for appellee.

Considered by Vaitheswaran, P.J., Doyle, J., and Vogel, S.J.

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**VAITHESWARAN, Presiding Judge.**

Green Bay Levee Drainage District contracted with MEP Co. to reshape the levee. As part of the bid process before the contract was awarded, board members took MEP Co.'s owner Mike Pieper to "the various locations" from which dirt could be moved to complete the project. After MEP Co.'s bid was accepted, the company moved dirt from individual landowners' private property, rather than the authorized sites. Federal litigation ensued.

MEP Co. had a commercial general liability (CGL) policy with Addison Insurance Company. Addison sued MEP Co. for a judgment declaring that its policy provided no coverage for MEP Co.'s expenses in the federal litigation. Following trial, the district court found in favor of Addison, concluding, "[t]he commercial general liability insurance policy . . . affords no coverage."

On appeal, MEP Co. raises several arguments in support of reversal. First among them is a contention that "the insuring agreement provides coverage for occurrences resulting in property damage." This issue is the only one we find it necessary to address.

We begin with the policy language. The insuring agreement provides coverage for "those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage.'" The agreement further obligates the insurer "to defend the insured against any 'suit' seeking those damages." However, the insurer "will have no duty to defend the insured against any 'suit' seeking damages for . . . 'property damage' to which this insurance does not apply." The insurance "applies to . . . 'property damage' only if . . . [t]he . . . 'property damage' is caused by an 'occurrence.'" The insuring agreement defines

"occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

The supreme court interpreted the identical definition of "occurrence" in *National Surety Corp. v. Westlake Investments*, *LLC*, 880 N.W.2d 724, 735 (Iowa 2016). The court held, "An intentional act resulting in property damage the insured did not expect or intend qualifies as an accident amounting to an occurrence as defined in a modern standard-form CGL policy so long as the insured did not expect and intend both the act itself and the resulting property damage." *Westlake*, 880 N.W.2d at 736; *cf. Pursell Constr.*, *Inc. v. Hawkeye-Security Ins. Co.*, 596 N.W.2d 67, 71 (Iowa 1999) (holding "defective workmanship standing alone . . . is not an occurrence under a CGL policy"); *Yegge v. Integrity Mut. Ins. Co.*, 534 N.W.2d 100, 103 n.3 (Iowa 1995) (noting policy defined "occurrence" as "an accident including continuous or repeated exposure to substantially the same general harmful conditions"); *Hudson Hardware Plumbing & Heating*, *Inc. v. AMCO Ins. Co.*, No. 15-1677, 2016 WL 5930779, at *6 (Iowa Ct. App. Oct. 12, 2016) (characterizing *Westlake* as "a bit of a game changer").

Applying *Westlake*, the district court made the following pertinent findings:

> Analyzing whether MEP Co.'s actions in intentionally removing dirt from unauthorized sites qualifies as an accident under the CGL policy boils down to a determination by the Court of whether [MEP Co.] did not expect and intend both the act of removing the dirt and the resulting property damage. Pieper claims he intentionally removed dirt from the [individual property owners'] sites but he did not expect or intend resulting property damage because he believed it was permissible to remove dirt within the 150-foot easement the [d]istrict had over the levee. MEP Co. claims Pieper did not intend to harm the property owned by [private landholders]; therefore, the removal of the dirt was an accident.
>
> The Court rejects Pieper's assertion. First and foremost, Pieper's testimony on this issue lacks credibility. Pieper knew the

location of the explicitly authorized borrow sites. He attended the meeting at which [a board member and engineer] were also present. The location of the authorized borrow sites was carefully described, and Pieper even marked the locations on a map. [A board member, engineer, and Pieper] physically visited these sites. Pieper cannot dispute the fact that he had specific knowledge of the location of the explicitly authorized borrow sites. Nonetheless, when it came time to perform the contract, Pieper chose to remove dirt from the [individual landowners'] properties.

Initially, when the board heard that MEP Co. was removing dirt from unauthorized sites, Pieper was confronted with this allegation. He denied removing dirt from unauthorized sites. Later, when Addison became involved and [Addison's claims adjuster] began his investigation, he interviewed Pieper. At that point, Pieper claimed that the sites from which MEP Co. removed dirt had actually been approved, retroactively, by the board. Pieper claimed this approval could be found in the board minutes. This claim proved to be blatantly false. Finally, and as part of this insurance litigation, Pieper now claims he had implicit authorization to remove dirt from sites, other than the explicitly authorized sites, based on the board's right of easement over the land 150 feet from the centerline of the levee. This is really nothing more than an after-the-fact rationalization thought up as a way to justify Pieper's wrongful acts.

When Pieper directed MEP Co. to remove tens of thousands of yards of dirt from unauthorized sites, what he really intended was simply not to be caught. Photographs of the area in question show undeveloped property that seems remote and uninhabited. Pieper assumed he could get away with removing dirt at these locations only one-half mile from the levee reshaping and restoration. This would save Pieper significant out-of-pocket expenses in performance of the contract. Had Pieper actually used the explicitly authorized borrow sites, he would have been trucking dirt five or six miles for each haul. This would have greatly increased his costs. Instead, Pieper chose to fulfill the contract in a "quick and dirty fashion." The cost to Pieper of hauling dirt from the unauthorized sites greatly reduced his expenses and increased his profit. He did not intend to be caught hauling dirt from unauthorized sites, but once he was caught, he is claiming he did not intend to harm the property. The Court rejects this claim and makes a finding that Pieper knew and intended to harm the [individual landowners'] propert[ies], but at the same time, he intended to simply not be caught.

The Court must also gauge the credibility of Pieper's claim that he did not intend to harm the [individual landowners'] propert[ies] based on his background. Pieper claims he reasonably believed he had implicit authority to remove dirt from the unauthorized sites because the land was within the 150-foot easement of the levee. However, Iowa Code section 468.380 prohibits any person or

corporation from removing earth within 300 feet of the centerline of any levee without first securing permission to do so from the governing body of the levee district. Is it conceivable that Pieper was unaware of this Code section? Pieper has for years lived and farmed in the levee district. He owns and operates a construction company which specializes in earth moving. This company is located in the levee district. Finally, Pieper served on the levee district board for 20 years and for a period of time, he was the chairman of the board. Given that background, it is inconceivable that Pieper did not know and understand he could not remove dirt from any location within 300 feet of the levee centerline without first securing permission from the district board.

MEP Co. concedes the district court's findings "are binding if supported by substantial evidence." *See Grinnell Mut. Reinsurance Co. v. Voeltz*, 431 N.W.2d 783, 785 (Iowa 1988) ("[T]he district court's findings of fact have the effect of a jury verdict and are binding on us if supported by substantial evidence."). The company simply argues, "The Court's holding is unsupported by the evidence." To the contrary, the record is replete with evidence supporting the district court's findings. We find it unnecessary to recount that evidence. Suffice it to say that, together with the weight we afford the district court's credibility findings against Pieper, the substantial evidence standard is more than satisfied.

We turn to the district court's conclusions of law:

[T]he facts of this case lead to the inescapable conclusion that Pieper knew exactly what he was doing; that the removal of the dirt from sites other than those explicitly authorized was wrongful; and that Pieper intended and expected the resulting harm, although [the owner] intended not to be caught. The Court concludes MEP Co.'s intentional acts of removing dirt from unauthorized borrow sites do not constitute an accident and does not qualify as an occurrence covered by Addison's CGL policy. Addison did not have a duty to defend MEP Co. concerning any claims asserted against it by the district or third parties, nor must Addison indemnify MEP Co. for any losses sustained based on the contract dispute between MEP Co. and the district. The Court, having reached the conclusion that MEP Co. does not have coverage under the insurance contract, [finds] there is no need to analyze exclusions. Moreover, because there is

no coverage, MEP Co.'s claim for damages and attorney fees must be denied.

We discern no error in the court's conclusions. *See Pursell*, 596 N.W.2d at 69 (reviewing declaratory judgment action tried at law for errors at law). We affirm the district court's declaratory judgment in favor of Addison.

**AFFIRMED.**