[Cite as *Ohio N. Univ. v. Charles Constr. Servs., Inc.*, 2017-Ohio-258.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

**OHIO NORTHERN UNIVERSITY,**

    **PLAINTIFF-APPELLANT,**

    **v.**                             **CASE NO. 5-16-01**

**CHARLES CONSTRUCTION
SERVICES, INC.,**

    **DEFENDANT-APPELLANT,**

    **-and-**                        **O P I N I O N**

**CINCINNATI INSURANCE COMPANY,**

    **DEFENDANT-APPELLEE.**

---

**Appeal from Hancock County Common Pleas Court
Trial Court No. 2012 CV 00564**

**Judgment Reversed and Cause Remanded**

**Date of Decision:   January 23, 2017**

---

**APPEARANCES:**

    *Allen L. Rutz* **for Appellant, Ohio Northern University**

    *David P. Kamp* **for Appellant, Charles Construction Services, Inc.**

    *David W. Orlandini* **for Appellee, Cincinnati Insurance Company**

**SHAW, J.**

{¶1} Plaintiff-appellant, Ohio Northern University ("ONU"), and defendant-appellant and third-party plaintiff, Charles Construction Services, Inc. ("CCS"), appeal the December 18, 2015 judgment of the Hancock County Court of Common Pleas granting the motion for summary judgment filed by appellee, Cincinnati Insurance Company ("CIC"), and finding that CIC does not owe a duty to defend and indemnify CCS against the claims brought by ONU based upon property damage resulting from defective work performed by CCS's subcontractors. As a result of the trial court's ruling, CIC was terminated from the underlying action. On appeal, both ONU and CCS claim that the trial court erred when it determined that the Commercial General Liability ("CGL") policy purchased by CCS from CIC did not provide coverage.

### *Relevant Facts*

{¶2} In 2008, ONU entered into a contract with CCS for the construction of "The Inn, a new luxury hotel and conference center on ONU's Campus, including a 57,000 square feet building consisting of guest rooms, meeting rooms, a kitchen, a laundry, a spa, a front desk lobby, an office area, and support areas." (Doc. No. 132 at 2-3).

{¶3} In 2011, after construction on The Inn was complete, ONU discovered evidence of water intrusion and moisture damage to the wall coverings, dry wall,

insulation, and wooden sheathing in several guest rooms and emerging evidence of moisture damage on wall coverings in other rooms and in one stairwell. Further investigation revealed extensive water intrusion and moisture damage in virtually all areas of The Inn's exterior walls. In the course of remediating the water damage, ONU discovered additional, serious structural defects. The repairs included replacing extensive areas of water-damaged wood sheathing and rim joists, necessitating complete removal and replacement of the brick and masonry façade.

### *Procedural Background*

{¶4} On October 25, 2012, ONU initiated this lawsuit against CCS, alleging breach of contract, breach of express warranty, breach of implied warranties, and negligent misrepresentation. ONU sought to recover damages related to the deficient construction services performed by CCS and its subcontractors. Upon answering ONU's complaint, CCS initiated a third-party action against many of its subcontractors.

{¶5} On October 24, 2013, CIC filed a motion for leave to intervene in the action, which was subsequently granted. CIC filed a cross-claim for a declaratory judgment against CCS, asking the trial court to declare that CIC's policy did not provide coverage to CCS with respect to any of the claims asserted by ONU, and that CIC did not owe a duty to defend and indemnify CCS with respect to ONU's claims.

{¶6} On January 30, 2015, CIC filed a motion for summary judgment on its cross-claim for a declaratory judgment. In support of its motion, CIC relied upon *Westfield Ins. Co. v. Custom Agri Systems, Inc.*, in which the Supreme Court of Ohio held "that claims of defective construction or workmanship brought by a property owner are not claims for 'property damage' caused by an 'occurrence' under a commercial general liability policy." 133 Ohio St.3d 476, 2012-Ohio-4712, ¶ 21. CIC maintained that because ONU failed to assert claims for "property damage" caused by an "occurrence" coverage under the CGL policy was not triggered and, therefore, CIC did not have a duty to defend and indemnify CCS against ONU's claims for defective workmanship and misrepresentation. Accordingly, CIC argued that no genuine issues of material fact existed and that it was entitled to judgment as a matter of law.

{¶7} On February 13, 2015, ONU filed a cross-motion for summary judgment, opposing CIC's motion for summary judgment.[1] In an accompanying memorandum, ONU claimed that CCS did little of the construction work on the project itself; rather CCS's subcontractors were the ones who performed much of the construction and were responsible for the alleged property damage. ONU argued that the "products-completed operations hazard" included in CIC's CGL policy, as well as applicable exceptions to exclusions, specifically provided

---

[1] We note that the record demonstrates that ONU was named as an "additional insured" on CIC's policy with CCS.

coverage for its claims against CCS. ONU maintained that the Supreme Court's holding in *Custom Agri* was not dispositive of the issue raised in this case because the *Custom Agri* case did not determine what constitutes an "occurrence" under a "products-completed operations" policy when an owner alleges claims of "property damage" caused by the defective workmanship of the insured's subcontractors. Therefore, ONU argued that based upon the specific policy language in this CGL, CIC had a duty to defend and indemnify CCS against its claims.

{¶8} On February 27, 2015, CCS filed a memorandum supporting ONU's position that the facts in *Custom Agri* were distinguishable from the present case, and that the "products-completed operations" coverage, which is triggered by "property damage" caused by or to the work of a subcontractor, required CIC to defend and indemnify it against ONU's claims.

{¶9} The record reflects that neither CIC's, ONU's, nor CCS's positon with respect to summary judgment was premised upon a question of fact. Rather, both CIC and ONU filed cross-motions for summary judgment seeking a declaration on coverage for ONU's claims under the CGL.

{¶10} On September 16, 2015, the trial court granted CIC's motion for summary judgment and overruled CCS's motion for the same. The trial court addressed the arguments raised by CCS and concluded that the holding in *Custom Agri* was specifically applicable to the circumstances in this case, regardless of

whether the defective workmanship was that of the insured or the insured's subcontractor. The trial court further concluded that the "products-completed operations" coverage and related exclusions and exceptions did not operate to "expand" coverage for "property damage" in the absence of an "occurrence." Therefore, the trial court found that it was "constrained to conclude that the CGL issued in this case does not provide coverage because the subcontractors' alleged defective workmanship is not an 'occurrence.' " (Doc. No. 328 at 11).

{¶11} However, even though the trial court's September 16, 2015 judgment entry addressed the merits of the cross-motions for summary judgment on the issue of insurance coverage, it failed to articulate the rights and responsibilities of the parties implicated by CIC's declaratory judgment claim. The judgment entry also failed to include certification of "no just cause for delay" pursuant to Civ.R. 54(B), and instead stated "all until further order by the court" in the judgment entry, indicating a lack of a final appealable order due to the trial court's intention of taking further action in the case. Consequently, this Court dismissed ONU's and CCS's first appeal on November 13, 2015, based upon the outstanding declaratory judgment claim, the indication by the trial court in its September 16, 2015 judgment entry that further proceedings were pending, and the failure to properly invoke our jurisdiction pursuant to R.C. 2505.02, which only permits us to review final orders.

**{¶12}** On December 18, 2015, a subsequent judgment entry was filed specifically addressing the various grounds set forth in the dismissal entry of this Court pertaining to CIC's claim for declaratory judgment. The December 18, 2015 judgment entry included language incorporating the legal conclusions made by the trial court in its September 16, 2015 judgment entry and expressly declared that CIC did not owe a duty to defend and indemnify CCS against ONU's claims for property damage and repairs of the defects. The judgment entry also terminated the action as to CIC.

**{¶13}** ONU and CCS each filed a notice of appeal, asserting the following assignments of error.

### ONU's Assignment of Error No. I

**The trial court erred in concluding that CIC had no duty to provide insurance coverage to ONU and CCS for the damages caused by CCS's subcontractors.**

### CCS's Assignment of Error No. I

**By granting the motion for summary judgment of appellee The Cincinnati Insurance Company on the basis that there was no insurable "occurrence," the trial court erred in denying Appellants the contractual benefits of the insurance policy purchased from CIC.**

### CCS's Assignment of Error No. II

**By denying the Cross-Motion for Summary Judgment of Appellant Ohio Northern University on the basis that there was no insurable "occurrence," the trial court erred in denying**

**Appellants the contractual benefits of the insurance policy purchased from CIC.**

{¶14} Due to the interrelated nature of the assignments of error, we elect to discuss them together.

{¶15} On appeal, ONU and CCS each challenge the trial court's reliance on the Supreme Court of Ohio's decision in *Custom Agri* to conclude that coverage for ONU's claims related to property damage allegedly caused by the defective workmanship of CCS's subcontractors is precluded under the insurance policy purchased from CIC. Specifically, ONU and CCS argue that CCS purchased additional "products-completed operations" coverage, which expressly contemplates and provides coverage for ONU's claims against CCS and they point to certain policy provisions in support of their argument that coverage exists.

### *Standard of Review*

{¶16} We review a trial court's decision on a motion for summary judgment *de novo*. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Thus, this court conducts an independent review of the evidence and arguments that were before the trial court without deference to the trial court's decision. *Brown v. Cty. Commrs. of Scioto Cty.*, 87 Ohio App.3d 704, 711 (4th Dist.1993) (citation omitted).

{¶17} Pursuant to Civ.R. 56(C), summary judgment is appropriate only under the following circumstances: (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3)

viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, (1978). "When seeking summary judgment on grounds that the non-moving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the non-moving party's claims." *Lundeen v. Graff*, 10th Dist. Franklin No. 15AP-32, 2015-Ohio-4462, ¶ 11, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). Once the moving party meets its initial burden, the nonmovant must set forth specific facts demonstrating a genuine issue for trial. *Dresher* at 293.

{¶18} The underlying claims pertinent to this appeal are for defective construction of, or defective workmanship on, The Inn by CCS's subcontractors. The present action is one of contract interpretation, as the issue is whether the claims against CCS of the defective construction or workmanship of its subcontractors fall within the insurance policy issued by CIC.

> **When confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties to the agreement.** *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.* **(1999), 86 Ohio St.3d 270, 273, 714 N.E.2d 898, citing** *Employers' Liab. Assur. Corp. v. Roehm* **(1919), 99 Ohio St. 343, 124 N.E. 223, syllabus.** *See***,** *also***, Section 28, Article II, Ohio Constitution. We examine the insurance contract as a whole and presume that the intent of the parties is reflected in the language used in the policy.**

> ***Kelly v. Med. Life Ins. Co.*** **(1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the syllabus. We look to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy.** ***Alexander v. Buckeye Pipe Line Co.*** **(1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph two of the syllabus. When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties.** ***Id.*** **As a matter of law, a contract is unambiguous if it can be given a definite legal meaning.** ***Gulf Ins. Co. v. Burns Motors, Inc.*** **(Tex.2000), 22 S.W.3d 417, 423.**

*Westfield Ins. Co. v. Custom Agri Sys., Inc.*, 133 Ohio St. 3d 476, 478–79, 2012-Ohio-4712, ¶ 8, quoting *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, ¶ 11.

### *Westfield Ins. Co. v. Custom Agri Sys., Inc.*

{¶19} Central to the parties' argument on appeal is the applicability of the Supreme Court of Ohio's decision in *Westfield Ins. Co. v. Custom Agri Sys., Inc.* to the facts in the instant case. 133 Ohio St.3d 476, 2012-Ohio-4712. *Custom Agri* involved claims asserted in federal district court by a property owner for defective construction or workmanship of a steel grain bin against the contractor whom the owner hired to build a feed-manufacturing plant. *Custom Agri Sys., Inc.*, at ¶ 2. The contractor filed a third-party complaint against Custom Agri, the subcontractor who built the steel grain bin. *Id.* Westfield, Custom Agri's insurer, intervened in the lawsuit in order to pursue a judgment declaring that it had no duty to defend and indemnify Custom Agri under the terms of its CGL policy. *Id.* Westfield argued

that none of the claims against Custom Agri sought compensation for "property damage" caused by an "occurrence," and therefore that none of the claims were covered under the CGL policy. *Id*. at ¶ 3. In the alternative, Westfield argued that even if the claims were for "property damage" caused by an "occurrence," they were removed from coverage by an exclusion in the policy. *Id*.

{¶20} Both Westfield and Custom Agri filed cross-motions for summary judgment and agreed that Ohio law governed the case. *Custom Agri Sys., Inc.* at ¶ 4. The district court acknowledged that it was an open question under Ohio law whether defective-construction claims fall under the auspices of a CGL policy. *Id.* The district court assumed Custom Agri's policy covered defective construction and went on to conclude that coverage for the claims was precluded under an exclusion in the policy and ruled in Westfield's favor. *Id.* Custom Agri appealed to the Sixth Circuit, who after finding no controlling precedent under Ohio law, certified the following questions to the Supreme Court of Ohio:

> **(1) Are claims of defective construction/workmanship brought by a property owner claims for "property damage" caused by an "occurrence" under a commercial general liability policy?**
>
> **(2) If such claims are considered "property damage" caused by an "occurrence," does the contractual liability exclusion in the commercial general liability policy preclude coverage for claims for defective construction/workmanship?**

*Custom Agri Sys., Inc.*, 133 Ohio St. 3d 476, 478, 2012-Ohio-4712, ¶ 6. In addressing the first certified question the court in *Custom Agri* analyzed the

following policy provisions in the CGL, which are identical to the corresponding

provisions contained in the policy issued by CIC in this case.

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

\* \* \*

**SECTION I—COVERAGES**
**COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.    Insuring Agreement**

**a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:**

\* \* \*

**(2)    Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.**

\* \* \*

**b.    This insurance applies to "bodily injury" and "property damage" only if:**

**(1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;"**

\* \* \*

**SECTION V—DEFINITIONS**

**\* \* \***

**3.  "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.**

**\* \* \***

**13.  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.**

**\* \* \***

**17.  "Property damage" means:**

**a.  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or**

**b.  Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.**

*Custom Agri Sys., Inc.*, 133 Ohio St. 3d 476, 479, 2012-Ohio-4712, ¶ 9.

**{¶21}** The Supreme Court discussed the general principles underlying CGL policies and noted that "[c]ourts generally conclude that the policies are intended to insure the risks of an insured causing damage to other persons and their property, *but that the policies are not intended to insure the risks of an insured causing damage to the __insured's own work__*. [*Columbia Mut. Ins. Co. v. Schauf*, 967 S.W.2d 74, 77 (Mo.1998), quoting James T. Hendrick and James P. Wiezel, The New

Commercial General Liability Forms—An Introduction and Critique, Fedn. of Ins. & Corporate Counsel Quarterly 319, 322 (Summer 1986).] In other words, *the policies do not insure an insured's work itself; rather, the policies generally insure consequential risks that stem from the insured's work.*" *Custom Agri Sys., Inc.,* 133 Ohio St. 3d 476, 479, 2012-Ohio-4712, ¶ 10, quoting *Heile v. Herrmann*, 136 Ohio App.3d 351, 353 (1st Dist.1999) (emphasis added).

{¶22} The Supreme Court observed that

> **Here, all of the claims against which Westfield is being asked to defend and indemnify Custom relate to Custom's work itself, i.e., the alleged defective construction of and workmanship on the steel grain bin. Although it is a widely accepted principle that such claims are not covered by CGL policies, our inquiry cannot and must not end there. The issue we must decide is whether the CGL policy in the present case provides coverage to Custom for its alleged defective construction of and workmanship on the steel grain bin. Specifically, we must decide whether Custom's alleged defective construction of and workmanship on the steel grain bin constitute property damage caused by an "occurrence."**

*Custom Agri Sys., Inc.*, 133 Ohio St. 3d 476, 479, 2012-Ohio-4712, ¶ 11.

{¶23} Thus, the Supreme Court limited its discussion of the CGL policy provisions to those previously excerpted to determine whether an insured's own defective workmanship constitutes an "occurrence"—i.e., "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id*. In resolving this issue, the Supreme Court considered the nature of the term "accident," which is undefined in the CGL policy, as connoting something

"unexpected," "unintended," or "fortuitous," and ultimately concluded that "that claims for faulty workmanship, such *as the one in the present case*, are not fortuitous in the context of a CGL policy like the one here." *Id*. at ¶¶ 12-14 (emphasis added). The court was persuaded by the reasoning that "contractors' 'business risks' are not covered by insurance, but derivative damages are. *The key issues are whether the contractor controlled the process leading to the damages and whether the damages were anticipated*." *Id*. at ¶ 13, citing *JTO, Inc. v. State Auto. Mut. Ins. Co.*, 194 Ohio App.3d 319, 2011-Ohio-1452, ¶¶ 32-33 (11th Dist.) (emphasis sic).

{¶24} Accordingly, the Supreme Court answered the first certified question by holding that "claims of defective construction or workmanship brought by a property owner are not claims for 'property damage' caused by an 'occurrence' under a commercial general liability policy," and declined to answer the second certified question, finding it moot. *Id*. at ¶ 21.

### *CIC's Policy with CCS*

{¶25} On appeal in this case, ONU and CCS claim that the holding in *Custom Agri* does nothing more than confirm the well-established principle that CGL policies are not intended to protect against a *contractor's own defective work*. ONU and CCS assert that a different issue is raised in this case from the one addressed in *Custom Agri*. Here, ONU's claims against CCS involve allegations of "property damage" caused by the defective work of CCS's subcontractors that arose after the

project was completed. ONU and CCS argue that there are additional provisions in the CGL policy, which were not implicated in *Custom Agri*, that are specifically triggered by the claims in this case and demonstrate that there is coverage under the insurance agreement between CCS and CIC.

**{¶26}** For its part, CIC maintains that there is no distinction in the application of the *Custom Agri* holding between claims involving the defective workmanship of the insured and claims involving the defective workmanship of the insured's subcontractor. Therefore, CIC asserts that the *Custom Agri* case stands for the expansive proposition that *all* claims for defective workmanship, regardless of who performed it, are barred from coverage under a CGL policy because such claims can never constitute an "occurrence." Notably, this is also the same rationale used by the trial court in declaring that CIC had no duty under the CGL to defend and indemnify CCS against ONU's claims.

**{¶27}** We next turn to the CGL policy at issue in this case to determine whether the trial court erred in relying solely upon *Custom Agri* to conclusively determine as a matter of law that CIC does not have a duty to defend and indemnify CCS against ONU's claims. "The fundamental goal when interpreting an insurance policy is to ascertain the intent of the parties from a reading of the policy in its entirety and to settle upon a reasonable interpretation of any disputed terms in a manner designed to give the contract its intended effect." *Laboy v. Grange Indemn.*

*Ins. Co.*, 144 Ohio St. 3d 234, 236, 2015-Ohio-3308, ¶ 8, citing *Burris v. Grange Mut. Cos.*, 46 Ohio St.3d 84, 89 (1989). "Words and phrases must be given their plain and ordinary meaning 'unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument.' " *Id.*, quoting *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, (1978), paragraph two of the syllabus.

{¶28} Similar to the CGL policy at issue and analyzed in *Custom Agri*, the CGL issued by CIC in this case contains the following provisions regarding coverage of claims.

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

**\* \* \***

**SECTION I—COVERAGES**
**COVERAGE A. BODILY INJURY AND PROPERTY**
**DAMAGE LIABILITY**

**1.   Insuring Agreement**

**a.   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.  But:**

**\* \* \***

**(2)    Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under SECTION I—COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY; SECTION I—COVERAGES, COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY; or medical expenses under SECTION I-COVERAGES, COVERAGES C. MEDICAL PAYMENTS.**

**\* \* \***

**b.    This insurance applies to "bodily injury" and "property damage" only if:**

**(1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;"**

In "Section V—Definitions," the CGL policy defines the terms "occurrence" and

"property damage" to mean the following:

**16.    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.**

**\* \* \***

**20.    "Property damage" means:**

**a.    Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or**

**b.    Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.**

Plainly stated, the CGL policy issued by CIC in this case will cover "property

damage" caused by an "occurrence."  However, our inquiry does not stop here.  We

must review the entire contract and decide if there are any other provisions which speak to the claims at issue in this case—specifically, claims for "property damage" caused by the defective workmanship of the insured's subcontractor after the project is completed.

{¶29} This leads us to examine several exclusions and certain significant exceptions to those exclusions contained in CIC's policy. At the outset we note that "an exclusion in an insurance policy will be interpreted as applying only to that which is *clearly* intended to be excluded." *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.,* 64 Ohio St.3d 657, 665 (1992) (emphasis sic). With this mind, we turn to the policy language implicated in this case.

> **SECTION I—COVERAGES**
> **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
>
> **\* \* \***
>
> **2.    Exclusions:**
> **This insurance does not apply to:**
>
> **\* \* \***
>
> **j.    Damage to Property**
> **"Property damage" to:**
>
> **\* \* \***
>
> **(5)    That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; \* \* \***

{¶30} It is important to note that exclusion j(5) is stated in the present tense and clearly applies to work in progress. Thus, under this policy, faulty workmanship *during* construction is the responsibility of the insured, regardless of whether the insured or a subcontractor is performing the work. However, the record clearly establishes, and it is uncontested by the parties, that ONU's claims arose *after* construction on The Inn was complete. Therefore, the exclusion in j(5) does not apply to the instant case. [2] The next exclusion under j(6) states:

> **2. Exclusions:**
> **This insurance does not apply to:**
>
> **\* \* \***
>
> **j.  Damage to Property**
> **"Property damage" to:**
>
> **\* \* \***
>
> **(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.**

But, note that the following paragraph creates an *exception* to the j(6) exclusion:

---

[2] Notably, the exclusion from coverage in j(5) *is consistent* with the analysis in *Custom Agri* and the Supreme Court's reliance in that case upon *Essex Ins. Co. v. Holder*, in which the Arkansas Supreme Court reached the same result in resolving the question of whether "defective construction or workmanship is an 'accident' and, therefore, an 'occurrence' within the meaning of commercial general liability insurance policies." *Essex*, 370 Ark. 465, 467, 261 S.W.3d 456, 457 (2008). In *Essex*, homeowners filed suit against a homebuilder "*before the construction of the home was completed*" seeking damages for claims related to the defective workmanship of the homebuilder's subcontractors. *Essex,* 370 Ark. 465, 467, 261 S.W.3d 456, 457 (emphasis added). Therefore, even if the court in *Essex* had addressed the applicable exclusions in the insurance agreement, the result of a declaration of no coverage provided under the CGL policy would have presumably been the same under exclusion j(5).

**Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."**

In "Section V—Definitions," the CGL policy defines the terms "your work" and

"products-completed operations hazard" to mean the following:

**19. Products-completed operations hazard:**

**(a) Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:**

**(1) Products that are still in your physical possession; or**

**(2) Work that has not yet been competed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:**

**(a) When all of the work called for in your contract has been completed or;**

**(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site or;**

**(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.**

**Work that may need service, maintenance, correction, repair, or replacement, but which is otherwise complete, will be treated as completed.**

**b. Does not include "bodily injury" or "property damage" arising out of:**

     **(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;**

     **(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or**

     **(3) Products or operations for which the classification, listed in the Declarations or in a schedule, states that products-completed operations are included.**

     \* \* \*

**26. "Your work"**

    **a. Means:**

     **(1) Work or operations performed by you or on your behalf and;**

     **(2) Materials, parts or equipment furnished in connection with such work or operations.**

    **b. Includes:**

     **(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance, or use of "your work"; and**

     **(2) The providing of or failure to provide warnings or instructions.**

**{¶31}** Recapping the foregoing provisions, under exclusion j(6), there is no coverage under the CGL policy for "property damage" to "[t]hat particular part of any property that must be restored, repaired or replaced because "your work"

[regardless of whether it was performed by the insured or on the insured's behalf—i.e., a subcontractor] was incorrectly performed on it." However, the *exception* to exclusion j(6) *restores* such coverage if the "property damage" is included in the "products-completed operations hazard."

{¶32} The record further suggests that the products-completed operations coverage applies in this case because: (1) the declaration pages and premium audits issued by CIC to CCS indicate that specific, additional premium payments were made for the "products completed" coverage and; (2) construction on The Inn was complete when ONU's claims against CCS arose. [3]

{¶33} Finally, there is another and even more specific provision in the CGL policy issued by CIC in this case that involves an exclusion for "property damage" to "your work" with an express exception to that exclusion when the work is performed by a subcontractor:

> **2. Exclusions:**
> **This insurance does not apply to:**
>
> **\* \* \***
>
> **[L]. Damage to Your Work:**

---

[3] The declarations page for the insurance period effective May 2, 2006, includes a "products-completed operations aggregate limit" of two million dollars. The same declarations page indicates that $7,793.00 was specifically assessed by CIC for certain "products/completed operations" classifications. The insurance agreement between CCS and CIC indicates that CIC would perform premium audits and adjust CCS's premium. CCS claims that the premium adjustments were based, in part, on the dollar volume of completed work and the potential repair costs associated with that work. In a subsequent declarations page issued on May 2, 2009, after three years of construction, the amount specifically assessed for "products/completed operations" was increased to $27,308.00.

> **"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."**
>
> ***This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.***

(Emphasis added).

{¶34} In sum, the *exception* to exclusion [L] above *restores* coverage under the products-completed operations hazard for work that was done by a subcontractor or if the subcontractor's work itself was damaged. Thus, according to the specific exceptions to exclusion j(6) and exclusion [L], the products-completed operations coverage applies when: (1) the project was completed at the time the claim arose and; (2) the claim involved "property damage" caused by work performed on the insured's behalf by a subcontractor—which are the precise allegations underlying ONU's claims against CCS.

{¶35} CIC urges us to accept the position that the *Custom Agri* case establishes that *all* "property damages" arising from defective workmanship— regardless of who performed it—can as a matter of law *never* constitute an "occurrence," and that as a result any remaining or additional provisions, including those for which an additional premium may have been paid, are in essence moot and cannot trigger coverage under any circumstances. However, in making this argument CIC cannot reconcile the fact that its decision to include the entire

products-completed operations segment of the policy together with exclusions j(6) and [L] and their corresponding exceptions in the CGL that it issued to CCS, without a qualifying endorsement, is in direct conflict with its expansive interpretation of the *Custom Agri* case regarding the definition of an "occurrence." *See U.S. Fire Ins. Co. v. J.S.U.B.*, 979 So.2d 871, 891 (Florida Sup. Ct. 2007) (finding coverage under identical provisions in the CGL and stating that "if the insurer decides that this is a risk it does not want to insure, it can clearly amend the policy to exclude coverage, as can be done simply by * * * eliminating the subcontractor exception * * * "); *see, also, Lamar Homes Inc. v. Mid-Continent Casualty Company*, 242 S.W.3d 1, 12 (Texas Sup. Ct.) (noting a that "the Insurance Services Office has issued an endorsement that may be included in the CGL to eliminate the subcontractor exception to the "your-work" exclusion").

{¶36} We further find it noteworthy that CIC has failed to sufficiently explain on appeal what meaning exclusions j(6) and [L], and their corresponding exceptions, would have—if any—in light of its sweeping application of the *Custom Agri* holding to the circumstances presented in this case. It is well-settled that [w]hen interpreting a contract, we will presume that words are used for a specific purpose and will avoid interpretations that render portions meaningless or unnecessary." *Wohl v. Swinney*, 118 Ohio St.3d 277, 2008-Ohio-2334, ¶ 22, citing *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, ¶ 50. Thus, if we were to

accept CIC's position that "property damage" arising after the project is completed, which was caused by the defective workmanship of the insured's subcontractor can *never* constitute an "occurrence," we would in effect be rendering meaningless these additional and specifically *bargained for* provisions in the policy.

**{¶37}** We find it persuasive that other jurisdictions when confronted with the same question as the one before us have construed nearly identical CGL policy provisions to *permit* coverage for "property damage" occurring after the work is completed, which was caused by the faulty work an insured's subcontractor. In doing so, these jurisdictions have concluded that the defective work performed by an insured's subcontractor *may* constitute an "occurrence" triggering coverage under the standard-form CGL policy. *See e.g., National Surety Corporation v. Westlake*, 880 N.W.2d 724, 740-42 (Iowa Sup. Ct., 2016) (finding an insurable "occurrence" under identical provisions of the CGL policy involving resulting water and moisture damage caused by the defective work of the insured's subcontractor and stating that "[i]t would be illogical for an insurance policy to contain an exclusion negating coverage its insuring agreement did not actually provide or an exception to an exclusion restoring it"); *Cherrington v. Erie Insurance Property and Casualty*, 231 W.Va. 470 (2013); *Sheehan Construction Company, Inc. v. Continental Casualty Company*, 935 N.E.2d 160, 171-72 (Indiana Sup. Ct. 2010) (determining that a CGL policy containing the subcontractor exception to the "your

work" exclusion covered water damage caused by the defective work of the insured's subcontractor); *see also Lamar Homes Inc.*, 242 S.W.3d at 12 ("By incorporating the subcontractor exception into the 'your-work' exclusion, the insurance industry specifically contemplated coverage for property damage caused by a subcontractor's defective performance").

{¶38} In *Westlake*, the Supreme Court of Iowa not only concluded that defective work performed by an insured's subcontractor *may* constitute an "occurrence" triggering coverage under the CGL policy, but it also analyzed that state's prior case law which held, similar to the Supreme Court of Ohio's holding in *Custom Agri*, that an *insured's own defective work* did not constitute an "occurrence" under the CGL policy. The court in *Westlake* determined that these two conclusions were reconcilable due to the factual distinction in the prior case that it was the *contractor—i.e., the insured*—who performed the defective work, whereas in *Westlake*, and as in allegations involved in the instant case, the defective work was performed by the insured's subcontractor. The court in *Westlake* determined that the same exclusions and exceptions to exclusions which permitted coverage for the property damage caused by the faulty work of the insured's subcontractor were not implicated in the prior case involving the insured's own defective work. *See Westlake*, 880 N.W.2d at 737-38.

**{¶39}** While we find many of the principles set forth in *Westlake* to be relevant and applicable to the case before us, we decline to expressly adopt the decision of the Iowa Supreme Court in its entirety. In particular, we note that there is a significant distinction in the procedural posture of that case, in addition to the fact that the evidence in our case clearly suggests that a separate premium may have been paid for the products-completed operations provision of the CIC policy. Nevertheless, we specifically find it persuasive that the Iowa Justices articulated differing interpretations of law on the basic principle of whether the defective workmanship of an insured's subcontractor *could* trigger coverage under additional provisions of a CGL policy identical to those in the case before us. *See e.g., Westlake*, 880 N.W.2d at 744 (Justice Waterman dissenting, with Chief Justice Cady and Justice Mansfield joining the dissent); *see*, *also*, *Sheehan Construction*, 935 N.E.2d at 172-73 (Chief Justice Shepard dissenting, and Justice Sullivan also dissenting in a separate opinion, with which Chief Justice Shepard joined).

**{¶40}** However, the decisions of the Supreme Courts of Iowa and Indiana together with the division among the Justices of those Courts on this fundamental issue of law clearly establishes that there is a legitimate ambiguity in the specific language of this insurance policy as to whether the parties' intended to contract for coverage involving "property damage" caused by the defective workmanship of CCS's subcontractors arising after the project is complete. It is well-established

that "[w]here provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured." *King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208 (1988), syllabus.

### *Disposition*

**{¶41}** In sum, we conclude that the policy provisions set forth above, together with the supplemental premium classifications set forth in the declarations page of this policy, all of which clearly appear to contemplate coverage, at the very minimum create an ambiguity as to whether the parties intended and specifically contracted for "property damage" caused by a subcontractor's faulty workmanship in a completed project to either constitute an "occurrence" or, notwithstanding the definition of an "occurrence," to be independently covered via the insertion of specific exceptions to general exclusions within this particular CGL policy. As such, and in either event, we must liberally construe these policy provisions in favor of the insured.

**{¶42}** For the reasons stated above, we conclude that the trial court erred when it declared that CIC had no duty to defend and indemnify CCS against ONU's claims under the CGL policy issued by CIC. Accordingly, we sustain the assignments of error, reverse the judgment of the trial court, and remand the cause

Case No. 5-16-01

for further proceedings consistent with this opinion.

***Judgment Reversed and
Cause Remanded***

**FROELICH, J., concurs.**

**\*\* Judge Jeffrey E. Froelich of the Second District Court of Appeals, sitting by Assignment of the Chief Justice of the Supreme Court of Ohio.**

**ROGERS, J., dissents.**

**{¶43}** I must respectfully dissent from the opinion of the majority because I do not believe ONU and CCS can appeal from the underlying entry.

**{¶44}** On September 16, 2015, the trial court issued a "Decision and Order," granting CIC's motion for summary judgment and denying ONU's cross-motion for summary judgment. (Docket No. 328). ONU and CCS appealed, but the appeal was ultimately dismissed for lack of a final appealable order. *Ohio N. Univ. v. Charles Constr. Servs., Inc., et al*, 3d Dist. Hancock No. 5-15-29 (Nov. 13, 2015).

**{¶45}** On December 18, 2015, the trial court issued an "AGREED JUDGMENT ENTRY DISMISSING [CIC]." It stated:

> \* \* \*
>
> CIC [m]oved for [s]ummary [j]udgment on January 20, 2015 on the issue of insurance coverage. The [c]ourt having decided CIC's [m]otion for [s]ummary [j]udgment and the cross-motion for summary judgment filed by ONU, and being fully advised in the premises, hereby incorporates its Decision and order dated September

-30-

16, 2015 (the "Decision") herein. Now therefore, it is hereby ORDERED, ADJUDGED, AND DECREED:

1. CIC does not owe a duty to defend or indemnify CCS against claims for repair of defects in the work performed by CCS's employees in this action.

2. The reference to Products Completed Operations in CCS's commercial general liability insurance policy with CIC does not expand coverage beyond the stated coverage for "property damage" caused by an "occurrence."

3. CIC does not owe a duty to defend and indemnify CCS against claims for property damage occurring after completion of construction and caused by the defective work performed by CCS's employees in this action.

4. CIC does not owe a duty to defend or indemnify CCS against claims for repair of defects in the work performed by CCS's subcontractors in this action.

5. CIC does not owe a duty to defend or indemnify CCS against claims for property damages occurring after completion of construction and caused by the defective work performed by CCS's subcontractors in this action.

* * *

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that pursuant to R.C. 2505.02, all claims by CIC being fully decided, this Entry terminated this action as to CIC, and is a final appealable order.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that there is no just reason for delay, and thus, this Entry is a final and appealable judgment pursuant to Rule 54(B) of the Ohio Rules of Civil Procedure.

(Docket No. 385, p. 2).

{¶46} The agreed judgment entry was signed by counsel for ONU, CCS, and CIC under the phrase "AGREED TO BY." (*Id*. at p. 3).

{¶47} "An agreed judgment entry is a contract that is reduced to judgment by a court." *Sovak v. Spivey*, 7th Dist. Mahoning No. 02 CA 167, 2003-Ohio-6717, ¶ 25, citing *Spercel v. Sterling Industries, Inc.*, 31 Ohio St.2d 36, 39 (1972). The parties to an agreed judgment are bound "as if the merits had been litigated." *Id.*, citing *Gilbraith v. Hixson*, 32 Ohio St.3d 127, 129 (1987).

> "[A] party to a consent decree or other judgment entered by consent may not appeal unless it explicitly reserves the right to appeal. The purpose of a consent judgment is to resolve a dispute without further litigation, and so would be defeated or at least impaired by an appeal. The presumption, therefore, is that the consent operates as a waiver of the right to appeal. It is because the parties should not be left guessing about the finality and hence efficacy of the settlement that any reservation of a right to appeal should be explicit."

*Deutsche Bank Natl. Trust Co. Americas v. Weber*, 12th Dist. Butler No. CA2009-10-264, 2010-Ohio-1630, ¶ 14, quoting *Tradesmen Internatl., Inc. v. Kahoe*, 8th Dist. Cuyahoga No. 74420, 2000 WL 283081, * 7 (Mar. 16, 2000).

{¶48} "Of course, an agreed judgment entry is only binding on those parties entering into the agreement, assuming that those parties had the legal capacity to enter into a contract: '[I]f a party has not agreed to the judgment * * * it can hardly be said to be binding on that party.' " *Sovack* at ¶ 26, quoting *Hayes v. White*, 7th Dist. Columbiana No. 01 CO 00, 2001 WL 1568866, *4 (Dec. 3, 2001).

{¶49} In their supplemental briefs, the parties claim that the entry was drafted in accordance with Loc.R. 1.21(A) of the Court of Common Pleas of Hancock County, General Division and does not reflect an agreement that CIC had no duty to defend and indemnify CCS under the terms of CCS's insurance policy.

{¶50} Loc.R. 1.21(A) of the Court of Common Pleas of Hancock County, General Division provides,

> Counsel for the party in whose favor a judgment is rendered, or who is directed to do so by the Court, shall within ten (10) days thereafter, unless further time be given by the Court, prepare and submit a proposed judgment entry to opposing counsel who shall approve or reject it within five (5) days after its receipt. Within that five-day period, any counsel for a party objecting to a proposed judgment entry shall submit to the counsel who prepared the judgment entry a written letter or memorandum setting forth the bases of objection. If, within five (5) days of the notice of objection, the parties or counsel are unable to resolve the differences and submit to the Court an approved judgment entry, then either party or both may submit proposed judgment entries to the Court with a motion to journalize the judgment entry. In the absence of counsel's approval, the Judge may approve judgment entries in accordance with the record made of the proceedings.

{¶51} Proposed judgment entries are also discussed in the Ohio Rules of Civil Procedure. Civ.R. 58(A)(2) provides, "Approval of a judgment entry by counsel or a party indicates that the entry correctly sets forth the verdict, decision, or determination of the court and does not waive any objection or assignment of error for appeal." The Staff Note explains,

> [T]he rule was added in 1995 and is intended to address the decision of the Eighth District Court of Appeals in *Paletta v. Paletta* (1990),

68 Ohio App.3d 507. In *Paletta*, the court of appeals held that the appellant waived any objection to the judgment of the trial court when his attorney signed a proposed judgment entry and failed to file objections as required by local rule of court, notwithstanding the attorney's assertion that he did not intend to approve the entry but only to acknowledge its receipt. The 1995 amendment indicates that a party's approval of a proposed judgment entry only reflects agreement that the entry correctly sets forth the decision of the court and does not constitute a waiver of any error or objection for purposes of appeal.

{¶52} Here, there is no evidence in the record to suggest that the agreed judgment entry was actually a proposed judgment entry. Unlike the types of entries discussed in Loc.R. 1.21(A) and Civ.R. 58(A)(2), the entry's caption states, "AGREED JUDGMENT ENTRY DISMISSING [CIC]." (Docket No. 385, p. 1). It "ORDER[S], ADJUDGE[S], AND DECREE[S]" that CIC has no duty to defend or indemnify CCS under the terms of CCS's insurance policy, and it is signed by counsel for ONU, CCS, and CIC under the phrase "AGREED TO BY." (*Id.* at p. 2-3). Lastly, it is signed by the trial court and journalized by the Hancock County Clerk of Courts.

{¶53} There is no rule of civil procedure governing the creation of an agreed judgment entry or limiting its scope. Thus, an appellate court must look to the entry's language and the evidence in the record to determine whether the entry is an agreed judgment entry. While the parties claim in their supplemental briefs that they did not intend to create an agreed judgment entry, their briefs are not evidence. We are bound by the evidence in the record, and in this case, the evidence reflects

a judgment entry that was agreed to by all parties. If this was not the parties' intent, then revision must be attempted in the trial court. It is not a matter for this court to decide.

/jlr