**IN THE COURT OF APPEALS OF IOWA**

No. 23-0156
Filed June 5, 2024

**HEARTLAND CO-OP,**
        Plaintiff-Appellant,

**vs.**

**NATIONWIDE AGRIBUSINESS INSURANCE COMPANY,**
        Defendant-Appellee.
_____

        Appeal from the Iowa District Court for Polk County, Jeffrey D. Bert, Judge.


        Heartland Co-op appeals the district court's grant of summary judgment in favor of Nationwide Agribusiness Insurance Company. **AFFIRMED.**


        John F. Lorentzen of Nyemaster Goode, PC, Des Moines, for appellant.

        Sean M. O'Brien of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellee.


        Heard by Schumacher, P.J., and Ahlers and Langholz, JJ.

**AHLERS, Judge.**

Heartland Co-op (Heartland) is an agricultural cooperative with many business locations throughout Iowa and other states. In 2020, a derecho damaged several of Heartland's properties in Iowa. As Heartland was insured under a policy issued by Nationwide Agribusiness Insurance Company (Nationwide), Heartland made a claim under the policy. Among other coverages, the policy provided earnings-and-extra-expense coverage. In simplified terms, this coverage pays for loss of net income resulting from damage to insured properties from a covered peril and extra expenses that would not have been incurred but for the damage caused by the peril, such as relocation costs and costs to outfit and operate at a replacement or temporary location. The insurance policy limited the amount Nationwide would pay for this coverage to $3,000,000 for "any one loss."

After submitting its claim for the lost earnings and extra expenses caused by the derecho, Heartland received a total of $3,000,000 from Nationwide.[1] Heartland suffered lost earnings and extra expenses at multiple locations that, in total, exceeded $3,000,000, but Nationwide limited payment to $3,000,000 because it determined that the lost income and extra expenses suffered across all properties combined constituted a single loss to which the $3,000,000 limit applied. Heartland filed suit alleging breach of contract. Both parties moved for summary judgment. The district court granted summary judgment to Nationwide after finding

---

[1] Nationwide also paid Heartland $131,418,384.58 under other coverages for losses Heartland sustained from the derecho. Payment under those other coverages is not in dispute in this case. The dispute in this appeal is confined to how much Nationwide owes under the earnings-and-extra-expense coverage.

that the words "any one loss" mean the combined loss at all locations for one event.[2]  Heartland appeals.

We review summary judgment rulings for correction of errors at law. *Lennette v. State*, 975 N.W.2d 380, 388 (Iowa 2022).  A party is entitled to summary judgment when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Iowa R. Civ. P. 1.981(3).  Material facts are those that affect the outcome of the suit, and a fact issue "is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmoving party."  *In re Est. of Franken*, 944 N.W.2d 853, 858 (Iowa 2020) (cleaned up) (citation omitted).  The movant bears the burden of proving the "undisputed facts entitle[] it to summary judgment."  *Behm v. City of Cedar Rapids*, 922 N.W.2d 524, 542 (Iowa 2019).  We review the record in the light most favorable to the nonmoving party and make on their behalf all "legitimate inference[s] that can be reasonably deduced from the record."  *Homeland Energy Sols., LLC v. Retterath*, 938 N.W.2d 664, 683 (Iowa 2020) (quoting *Phillips v. Covenant Clinic*, 625 N.W.2d 714, 717–18 (Iowa 2001)).

---

[2] Heartland also argued to the district court that it should have the chance to prove at trial that the derecho was not a single storm.  The district court found that the evidence did not establish a genuine issue of material fact as to whether the derecho was a single weather event.  The court found that the derecho was a single weather event for purposes of the insurance policy and granted summary judgment to Nationwide.  Heartland appeals this issue but barely mentions it in its brief.  The brief cites no parts of the record generating a factual dispute on this issue and cites no pertinent authority.  Therefore, we find the issue waived.  Iowa R. Civ. P. 6.903; *Soo Line R.R. Co. v. Iowa Dep't of Transp.*, 521 N.W.2d 685, 691 (Iowa 1994) ("[R]andom mention of [an] issue, without elaboration or supportive authority, is insufficient to raise the issue for our consideration.").

We start by highlighting some of the key provisions pertaining to the earnings-and-extra-expense coverage, beginning with the one under the heading "HOW MUCH WE PAY" that reads, "'We' pay no more than the Income Coverage 'limit' indicated on the 'schedule of coverages' for any one loss." The pages that follow contain the schedule of coverages. Under the "Income Coverage Part" of the schedules, there is a list of potential coverages under the heading "COVERAGE (check one)" with a box to check next to each coverage listed. Only the box for "Earnings and Extra Expense" is checked. Thus, the parties do not dispute that the policy provides earnings-and-extra-expense coverage.

Following the list of coverages is the heading "LIMIT (check one)" followed by two options with a corresponding box to check beside each option. The first option states "Income Coverage Limit—The most 'we' pay for loss at any one 'covered location' is:." This option is unchecked, and no limit was filled in. The second option reads: "Refer to Scheduled Locations (check if applicable)." This option is checked, requiring the parties and us to look to the location schedules to determine the applicable limit of coverage.

The location schedules that follow start with a schedule that describes the covered location as location number "087 ALL 'COVERED LOCATIONS.'" This page lists five types of coverage, including earnings-and-extra-expense coverage with a limit of $3,000,000—the coverage at issue here. Here is the pertinent part of that schedule:

| SCHEDULE | |
|---|---|
| **Loc. No.** | **Covered Locations (Describe)** |
| 087 | ALL "COVERED LOCATIONS" |

| **Covered Property/Coverage Provided (Describe)** | **Limit** |
|---|---|
| FENCES AT "COVERED LOCATIONS" | $50,000 |
| RAILROAD TRACKS AT "COVERED LOCATIONS" | $2,000,000 |
| BUSINESS PERSONAL PROPERTY CONSISTING OF SIGNS | $50,000 |
| EARNINGS AND EXTRA EXPENSE | $3,000,000 |
| BUSINESS PERSONAL PROPERTY CONSISTING OF "COMPUTERS" | $2,000,000 |

Following this schedule listing earnings-and-extra-expense coverage for "ALL 'COVERED LOCATIONS'" is a separate page for each of Heartland's eighty-six business locations in Iowa and other states (consecutively numbered as location numbers 001 through 086), with each of those eighty-six schedules listing coverages for that location and a corresponding limit amount for each coverage. None of the individual-location schedules lists any earnings-and-extra-expense coverage.

The dispute here comes down to whether the policy provides $3,000,000 of coverage for each location that sustained an earnings-and-extra-expense loss or whether it provides $3,000,000 of coverage for all earnings-and-extra-expense loss Heartland sustained across all eighty-six locations (or as many of them as sustained damage from the derecho). This requires us to interpret and construe the policy. When we interpret an insurance policy, we determine the meaning of the words it contains. *Boelman v. Grinnell Mut. Reins. Co.*, 826 N.W.2d 494, 501–02 (Iowa 2013). When we construe the policy, we give those words legal effect. *Id.* Both interpretation and construction are matters for the court. *Id.* (noting that interpretation is a matter for the court unless extrinsic evidence comes into play

and that construction is always a matter for the court). If a policy term is undefined, we give the term its ordinary meaning, rather than a technical or specialized meaning. *Wakonda Club v. Selective Ins. Co. of Am.*, 973 N.W.2d 545, 549 (Iowa 2022). If the language has more than one reasonable interpretation, it is ambiguous and will be interpreted in favor of the insured. *Id.* A term is not ambiguous simply because the parties disagree on its meaning. *Id.*

Pared down to its essence, this case hinges on what is meant by "any one loss" in the context of the earnings-and-extra-expense coverage. The district court concluded that the terms of the insurance contract created a $3,000,000 limit for the lost earnings and extra expenses suffered across all Heartland business locations, so Heartland experienced only one loss. Heartland claims this conclusion was erroneous because "any one loss" means the limit applies individually to the losses suffered at each location or at least is ambiguous and should therefore be interpreted in Heartland's favor. *See id.* ("We interpret ambiguous policy provisions in favor of the insured . . . .").

The Iowa Supreme Court has already determined the word "any" means "all or every." *Thomas v. Progressive Cas. Ins. Co.*, 749 N.W.2d 678, 683 (Iowa 2008). Merriam-Webster defines "loss" as "destruction, ruin," and more relevant to the coverage at issue here, "failure to gain, win, obtain, or utilize." *Loss*, Merriam-Webster, http://www.merriam-webster.com/dictionary/loss (last visited May 30, 2024) (giving "*loss* of income/revenue" as an example use of loss under the fourth definition). Black's Law Dictionary defines "loss" as "[a]n undesirable outcome of a risk; the disappearance or diminution of value." *Loss*, Black's Law Dictionary (11th ed. 2019). And it defines "loss" in the insurance context as "[t]he amount of

financial detriment caused by . . . an insured property's damage, for which the insurer becomes liable." *Id.*

Giving the words in the policy their ordinary meaning does not clarify whether an individual loss is considered in terms of the company as a whole or in terms of the individual locations. Reading this language in the context of the rest of the policy provides more clarity. *See Nat'l Sur. Corp. v. Westlake Inv., LLC*, 880 N.W.2d 724, 734 (Iowa 2016) ("[W]e determine whether an ambiguity exists not by examining clauses seriatim, but by interpreting the policy in its entirety, including all endorsements, declarations, or riders attached."). Heartland does not have per-location coverage because the box for per-location coverage was not checked. Instead, the other box was checked, referring to the location schedules to find the limit. This alone suggests that loss is not determined per location. That suggestion becomes stronger when we look at the location schedules that follow. The limit for earnings-and-extra-expense coverage is found on the schedule for "all covered locations" and not on any of the individual-location schedules. "All covered locations" is not the same as "each covered location." Because "all covered locations" cannot reasonably mean the coverage applies to "each location" (because Heartland does not have per-location coverage), it must mean it applies to the locations in the aggregate. Therefore, in the context of the policy as a whole, we read "any one loss" to mean the aggregate loss experienced by Heartland as a whole across "all covered locations."

Heartland tries to get around the fact that a per-location limit was not part of the policy by pointing to other parts of the policy. It points out that the policy provides coverage "during the 'restoration period' when 'your' 'business' is

necessarily wholly or partially interrupted by direct physical loss of or damage to property at a 'covered location.'" Heartland argues this policy language ties the restoration period and its loss calculation methods to the definition of "any one loss." The policy defines the restoration period as:

> 1. The time it should reasonably take to resume "your" "business" to a similar level of service beginning:
> a. for earnings, after the first 72 hours (unless otherwise indicated on the "schedule of coverages") following the direct physical loss of or damage to property at a "covered location" that is caused by a covered peril; and
> b. for extra expenses, immediately following the direct physical loss of or damage to property at a "covered location" that is caused by a covered peril.
> The "restoration period" ends on the date the property should be rebuilt, repaired, or replaced or the date business is resumed at a new permanent location.

Heartland claims the words "*a* covered location" is in line with covering a loss at "*any* covered location." (Emphasis added.) Heartland also points out that the policy includes a "Valuation" section, describing how an earnings loss is calculated. This section notes that "pertinent sources of information" include "'your' accounting procedures." Heartland contends these two policy provisions demonstrate that "any one loss" allows it to recover for each loss with a $3,000,000 limit at each location.

We are not persuaded by Heartland's argument. The reference to "a covered location" in defining the restoration period simply confirms that the coverage only applies to those locations that were damaged by a covered peril. No one disputes that Heartland has coverage during the restoration period at each covered location that incurred lost earnings and extra expenses caused by the derecho. The dispute is whether those amounts of lost earnings and extra

expenses are all part of one loss at "all covered locations," as opposed to being separate losses with separate limits. The reference to "a covered location" in the definition of restoration period sheds no helpful light on resolving the dispute at hand.

We are also not persuaded by Heartland's argument that, because the policy says the parties look to Heartland's accounting procedures to determine the value of Heartland's loss and Heartland has separate accounting for each location, the policy requires the loss suffered by each location to be a separate loss under the policy. The policy's reference to Heartland's accounting practices is in the valuation section of the policy. By its plain terms, this section says the accounting practices are a pertinent source of information in calculating the amount of the loss. It sheds no meaningful light on determining whether a loss occurred and whether that loss is a separate loss for each location.[3]

Heartland tries to weave together the language in the "restoration period" and "valuation" parts of the policy to argue separate locations suffered separate losses because the restoration periods for each location are different, as are the accounting procedures for determining profit and loss. Presumably, Heartland does this weaving because it has to differentiate between a "per location loss" and a "per location limit" due to the fact that the "per location limit" option was not a part of the policy. But we are not persuaded by Heartland's efforts. While we partly

---

[3] For example, whether Heartland uses a cash-basis or accrual accounting method or uses a LIFO (last-in, first-out) or FIFO (first-in, first-out) method for valuing inventory may be pertinent information in determining how to calculate lost earnings. But those accounting procedures have no bearing on determining whether "any one loss" refers to individual locations or "all covered locations."

understand the distinction Heartland is trying to make between a limit based on the definition of loss versus a per-location limit, we are unclear where the threshold for separate losses would be. Let's say the derecho had managed to shut down all affected locations at the same time, causing each location to pause its operations. The shutdowns happened at the same time, so assuming each location was restored at the same time, under Heartland's logic we could easily conclude Heartland suffered one all-encompassing loss. But if the shutdowns occurred minutes apart, and the restorations also happened minutes apart, would it still be considered one loss, even if the effect was the same? Heartland wants us to say the time differences between when its various locations were shut down as the derecho swept across Iowa was enough to cause separate losses. But we don't see a clear place to draw the line, and we see nowhere in the policy suggesting that such line must be drawn. And letting different accounting methods determine whether a loss occurred—in contrast to using different accounting methods to determine the amount of a loss—would create a loophole through which insureds could effectively turn their coverage limits into per-location limits without purchasing that option. The policy does not support such a conclusion.

To sum up, we don't find Heartland's reading of the policy to be a natural reading. *See Boelman*, 826 N.W.2d at 501 ("We will not strain the words or phrases of the policy in order to find liability that the policy did not intend and the insured did not purchase."). The only reasonable interpretation of the policy is that the limit applies to the loss suffered in the aggregate by the company as a whole— at "all covered locations"—so we conclude the policy language is not ambiguous. *See Nat'l Sur. Corp.*, 880 N.W.2d at 734 ("Policy language is ambiguous when,

considered in the context of the policy as a whole, it is susceptible to two plausible interpretations.").  Because the language is not ambiguous and the district court correctly interpreted and construed the terms of the insurance contract to conclude there is a single loss with a single limit of coverage, Nationwide established it is entitled to judgment as a matter of law, and we affirm.

**AFFIRMED.**

Schumacher, P.J., concurs; Langholz, J., dissents.

**LANGHOLZ, Judge** (dissenting).

What is "one loss" under a business interruption insurance policy that covers a business with eighty-six locations across the country? This term was put to the test when a historic derecho swept across Iowa, damaging at least forty-eight of Heartland Co-op's locations in the state—from Woodbine to Marengo. Because the insurance policy caps Heartland's coverage at $3 million "for any one loss," Nationwide Agribusiness Insurance Company argues—and the majority agrees—that Heartland is only entitled to $3 million for all its business-interruption losses caused by the property damage at these forty-eight locations.

But I respectfully part ways with the thoughtful majority opinion based on my interpretation of the text of the policy as a whole. Under the policy's text, a business-interruption loss is tied to physical loss or damage at a specific location. Thus, when more than one location has physical losses, the business interruption at each of those locations is multiple losses too. And because the $3 million limit is per loss—not per occurrence or per peril or capped by the catastrophe limit that the parties chose not to set—Heartland can claim up to $3 million for each of the business interruption losses arising from each of the physical losses at Heartland's locations.

I would hold that this interpretation is the unambiguous meaning of the policy. But at the very least, it shows that the policy "is fairly susceptible to two interpretations," and thus this interpretation "favoring the insured" must be adopted. *A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am.*, 475 N.W.2d 607, 619 (Iowa 1991). I would thus reverse the district court's contrary summary judgment rulings and remand for further proceedings.

Under Heartland's insurance policy, Nationwide will "pay no more than" $3 million "for any one loss" that is payable under its business interruption coverage—which the policy refers to as "Earnings and Extra Expense" coverage. I agree with the majority that the meaning of "one loss" is the fighting issue. But to best understand its meaning, rather than going to precedent or the dictionary, I would start with the policy's definition of its coverage for an earnings-and-extra-expense loss. *See Wakonda Club v. Selective Ins. Co. of Am.*, 973 N.W.2d 545, 553 (Iowa 2022) (looking to text of "policy as a whole" to find support for interpretation of disputed provision (cleaned up)); *cf. State v. McCollaugh*, 5 N.W.3d 620, 623 (Iowa 2024) (explaining in the related context of statutory interpretation, that when a drafter "chooses to act as its own lexicographer, we are normally bound by its definitions, even if they do not coincide with dictionary or common law definitions").

So under the policy, a covered earnings-and-extra-expense loss is the "actual loss of net income" and certain "extra expenses" when Heartland's "business is necessarily wholly or partially interrupted by direct physical loss of or damage to property *at a covered location* . . . as a result of a covered peril." (Emphasis added).[4] And Heartland's business is defined as "the usual business operations occurring *at a covered location*." (Emphasis added). Both the definition of the covered loss and of the business are tied to "a"—in other words, a single— "covered location." These provisions don't say at "any locations" or "all locations"

---

[4] For readability, I have omitted internal quotation marks used in the policy to identify defined terms and removed the capitalization of phrases that appear in all capitalized text without noting those omissions or at alterations.

or "across the entire business operations," as one would need to if intending to define "one loss" more broadly than just the interruption at a single location. Thus, because the scope of "any one loss" is the interruption from damage at a single covered location, the $3 million limit applies to that loss. And damage that interrupts business at another location triggers another loss that again has another $3 million limit.[5]

Other parts of the policy also suggest that the scope of one earning-and-extra-expense loss is only the loss caused by the physical loss at a single location. The policy's proof-of-loss provision requires the insured to provide "the time, place, and circumstances of the loss"—not the "places"—when making a claim. And the policy's definition of restoration period—which sets the time period for calculating the extent of earnings-and-extra-expense loss—is tied to "a physical loss of or damage to property at a covered location." The restoration period starts on "the date of a physical loss of or damage to property at a covered location." And it ends on the date that "property should be rebuilt, repaired, or replaced" or when "business is resumed at a new permanent location."

This definition of restoration period only makes sense in the context of "one loss" being the business interruption at a single location. For starters, it again speaks of a single covered location. It also does not include any text describing how the time period is calculated when there is physical damage at multiple locations, such as text specifying that it continues until every location is repaired

---

[5] Even Nationwide agrees that under the policy's terms, the $3 million limit applies only to "one loss," so payment for one earnings-and-extra-expense loss—however that term is properly interpreted—"does not reduce the limits applying to a later loss."

15

or only until the first location is repaired. But that additional explanation is unnecessary if each location with physical loss or damage is considered "one loss," each with its own restoration period easily calculated as described by the text of the policy's definition. This lack of any additional explanation in the definition thus further supports the narrow scope of "one loss" tied to the interruption caused by the physical loss or damage at a single location.

To be clear, I derive the scope of a single location from the policy's listing of eighty-six scheduled locations—not the accounting practices of Heartland. I agree with the majority that Heartland pushes its argument too far in suggesting that the policy left it to Heartland to decide the scope of "one loss" by how it chooses to structure its business or separately account for its net income. There is no support in the text of the policy for such an expansive discretionary power for Heartland to adjust the extent of its coverage unilaterally. But Heartland and Nationwide agreed to include the scheduled-location endorsement and specified eighty-six individual locations that are insured by the various coverages, including the earnings-and-extra-expense coverage. And so, relying on the policy's definition of a single location—which despite Heartland's broader theoretical arguments is all it actually seeks to do here—does not pose the line-drawing or loophole-creating problems the majority seeks to avoid.

Continuing to look at the policy as a whole, it also shows that its drafters knew how to set a coverage limit tied to something other than "any one loss." That includes setting limits for "any one occurrence" or "any one occurrence or at any one location," which it did for its supplemental utility-service-interruption and pollutant-cleanup-interruption coverage, respectively. And we can see the policy

setting a twelve-month, per-location limit for all "expenses arising out of a covered peril," as it did in its pollutant-cleanup-and-removal coverage. Indeed, the policy had a possible provision for a catastrophe limit that would have provided a total cap for all losses caused by the derecho—"for any combination of or total losses arising under one or more coverages in any one occurrence"—that the parties decided not to set in its schedule of coverages for the policy. If the earnings-and-extra-expense coverage had been limited in any of these ways, this would be a different case. But it was not so limited. Its $3 million limit was for "any one loss." And best interpreting the text actually chosen by the parties means that each location that had its business interrupted by physical loss or damage from the derecho suffered one loss, each separately subject to the $3 million limit.

I reach this result based on the text of the policy—not the precedent of other courts interpreting other policies. *See Wakonda Club*, 973 N.W.2d at 554. Indeed, the parties have not directed us to any cases deciding the precise issue here—and I am unaware of any. But interpreting "one loss" to be tied to a location of the property loss is consistent with the focus in other cases on the required connection between the business-interruption loss and a physical loss at the insured location. *See, e.g.*, *United Airlines, Inc. v. Ins. Co. of State of Pa.*, 385 F. Supp. 2d 343, 350–51 (S.D.N.Y. 2005) (rejecting argument that destruction of airline's ticket counter in the World Trade Center triggered coverage for business-interruption losses at all airline's locations as a result of the 9/11 terrorist attacks), *aff'd by* 439 F.3d 128 (2d Cir. 2006); *Ramada Inn Ramogreen, Inc. v. Travelers Indem. Co.*, 835 F.2d 812, 814 (11th Cir. 1988) (holding that business-interruption policy did not cover losses for hotel as a result of physical damage to adjacent restaurant

because restaurant building was "listed separately in the insurance policy, evidencing the intent of the parties to treat it as a separate entity"); *Wakonda Club*, 973 N.W.2d at 552–53 (requiring "physical element" to loss of the covered premises to trigger business-interruption coverage). And it's consistent with our supreme court's observation that business-interruption coverage is fundamentally "tied to the insured premises." *Steel Prods. Co. v. Miller's Nat'l Ins. Co.*, 209 N.W.2d 32, 38 (Iowa 1973).

To support its contrary interpretation, the majority relies on the parties' choice to set the $3 million limit in the location schedule rather than checking the box on the schedule of coverage to set a limit "for loss at any one covered location." While I understand the intuitive appeal of the negative implication that the majority reads into this, I don't give much weight to this drafting choice. Because whatever the effect would have been of checking the box, *the absence* of the provision does not change any of the policy's substantive text already discussed—all of which leads to the conclusion that "one loss" means the business interruption at one covered location. The only term left unaddressed in that substantive text is the dollar amount of the "limit indicated on the schedule of coverages for any one loss." And with the choice to set that limit in the location schedule instead, we look there to find the applicable limit: $3 million.

The majority also gives weight to the $3 million limit being listed on the location schedule under location number eight-seven, which is described as "all covered locations" rather than separately listed on the schedules for each of the eighty-six other locations that describe individual covered locations. According to the majority, the use of the word "all" in the description of the location means that

the limit set there is an aggregate limit for all locations. And I concede that this is the closest call in the proper interpretation of the policy. But I still respectfully disagree.

To properly interpret the meaning of this page, we first need to again remember that we've been sent on this cross-referencing hunt only to find the maximum amount to be paid "for any one loss." Nothing on this schedule page purports to change the limit from a per-loss limit to some other aggregate limit. Nor does it amend or conflict with any of the other text of the policy shaping what "one loss" means. It simply lists as a "coverage provided" the "earnings and extra expense" coverage with a "Limit" of "$3,000,000."

And the "all" that the majority finds significant merely appears in the description of the "Covered Locations," for the coverages listed. According to the text of the location schedule, the policy's coverage "only applies to the covered locations described below." So the purpose of the location description is to specify what locations are covered by the listed coverage provided—not to modify the coverage or limits listed.[6] By describing the location as "all covered locations," the schedule in turn cross-references the eighty-six specifically described locations. We thus know that *all* of those eighty-six locations have the earnings-and-extra-expense coverage in addition to the personal-property and building-property

---

[6] By choosing to include the location schedule and the related scheduled-location endorsement in the policy, the parties deviated from the default provision in the policy that coverage would be provided at "any location or premises where [Heartland has] buildings, structures, or business personal property covered under this coverage" rather than just at "a location that is described on the Location Schedule."

coverage listed on their individual schedules. That's all the work that I interpret the term "all" to do.

In isolation, the correct meaning of the schedule page might appear murkier. But we do not consider ambiguities "seriatim by clauses"—we must "read the policy as a whole." *Boelman v. Grinnell Mut. Reins. Co.*, 826 N.W.2d 494, 501 (Iowa 2013). And doing so, the best interpretation of the schedule page is that "all covered locations" just means that the $3 million limit is the limit that applies for "any one loss" at any of the locations (or as the policy says, at "all" of them) rather than implicitly adding a new aggregate business-wide limit not described anywhere in the policy.

Bottom line, Heartland is not limited to $3 million of business interruption coverage for all its losses because that limit is for "any one loss," and each location that had its business interrupted by physical loss or damage from the derecho suffered one loss. While I recognize that the majority has offered a thoughtful contrary interpretation, I would still hold that this interpretation favoring Heartland is the unambiguous meaning of the policy when read "as a whole." *Boelman*, 826 N.W.2d at 501. But even if the policy is "fairly susceptible to" the majority's interpretation too, then the interpretation "favoring the insured" must be adopted. *A.Y. McDonald Indus.*, 475 N.W.2d at 619. Either way, we should not affirm the district court's grant of summary judgment to Nationwide. And so, I respectfully dissent.